UNITED STATES of America,
Plaintiff–Appellee,

v.

Lafayette JAMES, Defendant–Appellant.

No. 96–2039.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1996.

Decided May 12, 1997.

Rehearing and Suggestion for Rehearing
En Banc Denied July 10, 1997.

---

Stephen B. Clark (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

W. Geary Jaco (argued), Kansas City, MO, for Defendant–Appellant.

Before WOOD, Jr., RIPPLE and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

After his trial and conviction on one count of using the United States Postal Service to facilitate possession with intent to distribute cocaine base, one count of possession of cocaine base with intent to distribute, and one count of conspiracy, Lafayette James was sentenced to 188 months in prison. James now appeals several aspects of his trial: namely, the district court's denial of his motion to suppress certain statements made during an interview with U.S. Postal Inspectors, and the prosecutor's use of peremptory challenges to allegedly exclude African–Americans from the jury. James also appeals his sentence, challenging the court's method of calculating the quantity of drugs attributable to him in computing his sentence, the court's refusal to grant him a reduction in his sentence for being a minimal participant, and the disparity between sentences for crack and powder cocaine in the Sentencing Guidelines. We affirm.

We begin with a brief factual summary of the events leading up to James' arrest and trial. On May 4, 1995, Postal Inspector Cynthia Kindell intercepted a suspicious package at Lambert Airport in St. Louis, Missouri. She opened it and discovered approximately 7.76 ounces of crack cocaine inside. After removing most of the cocaine, Inspector Kindell replaced a small amount and combined it with brown sugar so that the package looked and felt as though it had not been disturbed. The package was addressed to Virgil Lockett, 5720 N. Belt West, 34–164, Belleville, Illinois. Lorenzo White was the name of the sender, and the return address was 9145 S. Broadway, Los Angeles, California.

The Belleville address to which the package was sent was a Mailboxes, Etc. store located in Country Club Plaza; "164" designated a mailbox inside the store rented by Virgil Lockett. The store's owner gave the inspectors permission to make a controlled delivery of the package, and she allowed Postal Inspector Ed Moreno to remain inside the store and observe as the package was picked up. That afternoon, a person later identified as Virgil Lockett did pick up the package. Inspector Moreno notified other inspectors, who followed Lockett as he walked with the package along the shopping plaza. He briefly entered a supermarket, walking in one door and out the other. When he entered the parking lot, the agents arrested him and recovered the package.

Inspector Kindell discovered that six other packages had been delivered to Lockett at the Mailboxes Etc. address between November, 1994 and April, 1995. Each package had the same return address of 9145 S. Broadway, Los Angeles, California, which further investigation revealed was the address of a convenience store called Mom & Pop's. The name of the sender on four of the six packages was "Lorenzo White," and the two other packages had senders by the names of "Michael Jones" and "Tom Johnson."

In preparation for Virgil Lockett's trial, Inspectors Kindell and L.A. Armstrong traveled to Los Angeles to photograph the Mom & Pop's store and to interview any employees to see if they knew Virgil Lockett or anyone by the name of Lorenzo White, Michael Jones or Tom Johnson. They also had in mind the possibility of finding a suspect, so they brought along some handwriting exemplar forms.

When the inspectors arrived at the Mom & Pop's store, they asked to see the manager. Carrie Hicks, a cashier, directed them to Ralph Njoku, the assistant manager. What happened next is disputed: Kindell and Armstrong say they identified themselves to Njoku as postal inspectors and told him that they were investigating drug shipments through the mail. However, Njoku and Hicks testified that Kindell and Armstrong identified themselves as salespeople. In any event, Njoku told the inspectors that he did not recognize the names of Virgil Lockett, Lorenzo White, Michael Jones or Tom Johnson. Njoku had never heard of Lockett, and when he showed the inspectors a list of the store's employees, none of the other names appeared on the list. The name "Lafayette" was on the list, but without a last name. Njoku told the inspectors that Lafayette, the store's manager, wasn't working that day.

The next day, Kindell and Armstrong returned to speak with Lafayette, the manager, to see if he knew any of the individuals named on the mailing labels. Lafayette James was at the store, so the inspectors identified themselves, showed him their credentials, and asked if they could speak to him. James stated, "I've sort of been expecting you." He invited them into his office, a small 3 or 4 feet X 4 feet cubicle. At the time, Kindell and Armstrong were both armed, but they concealed their weapons, Kindell in her bag and Armstrong under his shirt. James told them his last name, explained that Virgil Lockett was his cousin, and said he had been expecting them because he knew Lockett had gotten into trouble.[1] To explain why the packages were sent from his store, he told the inspectors that in November of 1994, Lockett was starting a gun business and had contacted James to tell him that someone would be stopping by the Mom & Pop's. James said a man named Lorenzo White came to the store with an Express Mail package for James to mail, and that James filled out the mailing label and accompanied White to the post office. When Inspector Kindell asked James, "Once I check the surveillance film [at the post office], is there any reason why just your picture would show up?" James then said that he went into the post office alone to mail the package, while White stayed in the car.

At trial, James testified that the tone of their interview was open and conversational. He did not attempt to leave or ask the inspectors to leave. James stepped outside the office at one point to smoke a cigarette, and Inspector Armstrong accompanied him. At the end of the interview, Kindell and Armstrong asked James to fill out some handwriting exemplars. James later testified that he did so freely. After noticing that James' handwriting looked like the handwriting on the mailing labels, the inspectors told James that he was no longer just a potential witness, but a suspect, and they read James his *Miranda* rights.

After the interview, Kindell and Armstrong went to the Los Angeles post office and discovered three mailing labels for packages coming from Virgil Lockett to the Mom & Pop's store. They knew James had picked up the packages, because his signature was on the label as the recipient. Lockett testified at trial that the packages contained cash payments sent to James for the purpose of purchasing cocaine. The inspectors arrested James shortly afterward.

At James' trial, the 42–person jury pool contained nine African–Americans, and the final jury venire consisted of three blacks and nine non-blacks. The prosecutor attempted to strike seven of the panelists using peremptory challenges; he was successful in striking four blacks and two whites, and was unsuccessful in striking one black woman. He openly endorsed the two other black women who eventually sat on the jury. The court and James raised *Batson* challenges each time the prosecutor tried to strike an African–American from the jury, and after hearing the prosecutor's explanations, the court was satisfied that all but one were legitimate and race-neutral.

The jury found James to be guilty on all three counts. At sentencing, the court based James' offense level on the total weight of drugs involved in the conspiracy. Because only the last package of drugs was confiscated, the court used the weight of the drugs in that package to estimate the weights of the drugs in the other six packages. In the package that Inspector Kindell confiscated, cocaine comprised approximately 71 percent of the total weight. The court then multiplied the total weights of the other packages by 71 percent to come up with a total estimate of 36.56 ounces of cocaine. This translated to 1036.47 grams, which, because it was more than 500 grams, meant that James' offense level was set at 36. The court also denied James' request for a 2– to 4–level

---

1. Inspectors Kindell and Armstrong testified that when they made the trip to Los Angeles, they were not aware of Lafayette James' existence. They were also unaware of the fact that Lockett and James were cousins. During interviews with Lockett's relatives, someone had spoken of Lafayette but called him "Kim," his middle name. Kindell and Armstrong did not make the connection that Lafayette James and Kim James were the same person until Lafayette James' mother called him "Kim" in an interview sometime after the Los Angeles trip and James' arrest.

reduction for being a minimal or minor participant in a drug distribution scheme. James was sentenced to 188 months on the counts of using the mails to facilitate a drug-trafficking crime and distributing crack cocaine, and 48 months, to run concurrently, on the conspiracy count.

### I.

■ James asserts that Inspectors Kindell and Armstrong considered him a suspect when they made their trip to Los Angeles and interviewed him. Because of this and the circumstances surrounding the interview, he says, he was effectively in their custody and they should have read him his *Miranda* rights at the beginning of their interview, instead of at the end. As a result, James claims that his statements and his handwriting exemplars should have been suppressed at trial.

■ Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966). If a person is in custody, law enforcement officers may not interrogate him unless they have told the person that he has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney, either retained or appointed. *Id.* at 444, 86 S.Ct. at 1612. Thus, the *Miranda* issues in this case involve a two-part inquiry: whether James was in custody during the interview and, if he was in custody, whether the Postal Inspectors were interrogating him. This court has recently clarified the standard of review to be used when *Miranda* issues arise, and so we now review *de novo* the district court's determination that "custodial interrogation" did not occur in this case. *United States v. Yusuff*, 96 F.3d 982, 988 (7th Cir.1996), *cert. denied,* ⸻ U.S. ⸻, 117 S.Ct. 999, 136 L.Ed.2d 878 (1997); *see also*

*United States v. Hocking*, 860 F.2d 769, 772 (7th Cir.1988). However, any "historical" facts and credibility determinations are given deferential review, because "the trial court is in the best position to judge a witness's credibility and demeanor." *Yusuff,* 96 F.3d at 988; *see also Thompson v. Keohane,* ⸻ U.S. ⸻, ⸻, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).

■ This court has held that custody "implies a situation in which the suspect knows he is speaking with a government agent and does not feel free to end the conversation; the essential element of a custodial interrogation is coercion." *United States v. Martin,* 63 F.3d 1422, 1429 (7th Cir.1995). Furthermore, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994). In other words, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

In support of his contention that he was in custody, James relies on the testimony of Njoku and Hicks, who stated that the inspectors first identified themselves as salespeople. This misleading tactic, he implies, should alert the court to the fact that the inspectors came to the store with the purpose of eliciting a confession from him. He also points to the fact that Inspector Armstrong had three phone numbers relating to James in his possession, implying that Armstrong must have investigated James before traveling to Los Angeles, and so the inspectors must have been lying when they testified they had never heard of James before the trip.[2] However, the district court chose to believe the testimony of Inspectors Kindell and Armstrong when they said they did not identify themselves as salespeople and when

---

2. Kindell and Armstrong did have three phone numbers connected to James that had been written on the mailing labels: one was James' home telephone number, another was his mobile phone number, in his fiancee's name, and the third was

his mother's home telephone number. However, neither the inspectors nor anyone else presented testimony that the inspectors knew of the subscribers to these numbers when they went to Los Angeles.

they said they did not know of anyone named Lafayette James before they spoke to him. Because these are issues of credibility, we defer to the district court's determinations, which are not clearly erroneous. *Yusuff,* 96 F.3d at 988.

James also points to the fact that the inspectors came to speak with him at his place of business during the workday. He says this was a "coercive and premeditated tactic ... to render Mr. James helpless," because he was unable to leave work while employees and customers were present. James asserts that the inspectors should have called him or visited him at home, but that they did not do this, either "intentionally or through sheer laziness." Additionally, he points out that the inspectors chose to speak with him in a small, crowded office, which, because they stood in the doorway, prevented him from leaving the interview. These allegations go to whether a reasonable man in James' situation would have felt free to leave, which, because it is a mixed question of law and fact, is an issue that we review *de novo. Id.*

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Stansbury,* 511 U.S. at 322, 114 S.Ct. at 1529 (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)). An examination of these facts reveals that James was not in the inspectors' custody. When Kindell and Armstrong arrived at the Mom & Pop's store, they were there to gather information and take photographs. They did not have their guns displayed, nor did they threaten to arrest anyone. When they met James, they did not take him to a police station for questioning, but they spoke to him right at the store, in his own office. James testified at trial that the atmosphere was relaxed and casual. The room was small, but James himself invited them in (they did not "hustle" him into the office, as his brief characterizes the situation.[3]). Their conversation was lengthy, but mostly because the handwriting exemplars took time to complete. James stepped outside at one point to smoke a cigarette. At the end of the interview, the inspectors read him his *Miranda rights,* but did not arrest him, and he was free to go. Nothing about this interview leads us to conclude that James was under arrest or that his movement was restrained to the degree associated with a formal arrest. In fact, the scenario does not seem to be much different than it would be for any other person an investigator was interviewing as a potential witness, which, at the start of the interview, is what James was. A reasonable person being interviewed as a potential witness would not have felt like he or she was "in custody" in this situation. Furthermore, the inspectors' act of coming to James' place of work to speak with him does not appear to be coercive, underhanded, or lazy. Kindell and Armstrong needed to speak to the manager of the Mom & Pop's store, and, having been told the day before that "Lafayette," the manager, would be at work the next day, they returned to the store to speak with him. James' suggestion that they could have telephoned him or visited him at home lacks credibility, as the investigators, who did not know his last name until he told them, had no way of knowing how to reach him except by going to the store when they knew he would be there. He claims that by speaking to him during working hours, they effectively placed him in custody because he couldn't leave the store while customers were present. However, it seems to us that a reasonable person in his position, if he were busy working, could have asked the inspectors to come back at a more convenient time or could have arranged to meet them at a more comfortable place.

In addition, although the investigators began the interview considering James to be nothing more than a potential witness for Virgil Lockett's trial, during the course of the conversation, and especially after seeing the handwriting samples he gave, they came to view him as a suspect. This does not

---

3. The government has moved to strike this and other portions of James' brief. As we are affirming the district court's rulings, the motion is denied as moot.

change the fact that James was not in custody during the interview. An officer's "evolving but unarticulated suspicions do not affect the objective circumstances of the interrogation or the interview and thus cannot affect the *Miranda* custody inquiry." *Stansbury*, 511 U.S. at 324, 114 S.Ct. at 1530. Once Kindell and Armstrong told James that he was a suspect, they gave him the *Miranda* warnings. But even if they had considered him a suspect all along, as he alleges, he would not have been in custody, because they did not communicate those suspicions to him until the end of the interview, and even then they did not arrest him. An officer's "beliefs concerning the potential culpability of the individual being questioned . . . may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Id.* at 325, 114 S.Ct. at 1530.

The district court correctly stated that the central issue of this motion to suppress was whether James was in custody when the inspectors were interviewing him. In order for the inspectors to have interrogated James, as interrogation is defined for *Miranda* purposes, James would have had to be in custody. "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to express questioning or its functional equivalent. . . ." *Rhode Island v. Innis*, 446 U.S. 291, 301–302, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Thus, custody is a prerequisite for determining whether an interrogation took place, *see United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir.1996), and as we have agreed with the district court that James was not in custody, there necessarily cannot have been an interrogation. The district court took the approach of assuming that there was an interrogation to narrow the issue down, but did not make an express finding that an interrogation occurred. Because there was no custody, the investigators did not have to give James the *Miranda* warnings at the start of the inter-

view. James' motion to suppress was properly denied.

## II.

The second aspect of his case that James appeals is the process by which the jury in his trial was selected. James, an African–American, claims that the government showed a pattern of deliberately excluding African–Americans from the jury pool by its use of peremptory challenges, violating his rights under the Equal Protection Clause of the Fourteenth Amendment. The trial court granted all of the prosecutor's peremptory challenges except for one, concluding that the prosecutor's reasons were race-neutral. "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson v. Kentucky*, 476 U.S. 79, 98, 106 S.Ct. 1712, 1724, 90 L.Ed.2d 69 n.21 (1986). We will not overturn the district court's determinations on the issue of discriminatory intent unless they are clearly erroneous. *Hernandez v. New York*, 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991).

We have held that in analyzing a prosecutor's explanation and race-neutral reasons following a *Batson* challenge, the district court should determine whether the reasons "were legitimate or mere pretenses designed to mask purposeful, racial discrimination." *United States v. Chandler*, 12 F.3d 1427, 1432 (7th Cir.1994). "A neutral explanation in the context of our analysis here means an explanation of something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Hernandez*, 500 U.S. at 360, 111 S.Ct. at 1866.

In this particular case, the jury venire consisted of forty-two persons, nine of whom were African–American. Following voir dire, the prosecutor unsuccessfully moved to strike three jurors, two of whom were black, for cause.[4] The prosecutor was not asked to

---

4. The prosecutor moved to strike Juror No. 11

because her brother had been involved in a co-

provide race-neutral reasons for the strikes, but he nevertheless was concerned about the *Batson* issue and he asked the court whether there was a *Batson* problem with his for-cause challenges. The court told him that there were no *Batson* issues with his attempted strikes because they were denied and there were valid reasons for all of them.

The parties next proceeded to make their peremptory challenges. The government began by challenging Juror No. 4, an African–American woman. The court raised the *Batson* issue on its own, and the prosecutor gave as his reason that she was from Washington Park (a predominantly black town whose mayor had recently been prosecuted by the U.S. Attorney's Office) and that she did not seem attentive. The court did not consider this to be a valid reason and denied the strike. The prosecutor then told the court that he did not intend to strike Juror No. 8, another African–American woman, and the following exchange took place:

> The Prosecutor: You are bringing up the issue of race here and we're not to the point where she's the only potential black juror on the panel.

> The Court: That has nothing to do with it. If we had one white person and 30 African–Americans out there you would still have to give a reason. You still cannot strike African–Americans without giving a reason. As I understand the law, that's the law.

> The Prosecutor: It's my impression that you know, the *Batson* issue arises when you have a situation where the prosecutor is striking all black jurors and that's not my intention.

■ For the government's next peremptory challenge, it chose Juror No. 5, also an African–American woman. The prosecutor, giving his reason, stated: "[T]he reason I'm striking her also she looked like she was mad about being here. Your Honor, I'm serious. The expression on her face was such that she looked like she was just mad about being in the courtroom." He went on to explain that

he thought her expression may have meant that she held some animosity toward the government or the defendant. James' attorney raised a *Batson* challenge, but the court concluded that the government's reason was race-neutral. As "body language has long been used as a basis for peremptory challenges," *United States v. Hinton,* 94 F.3d 396, 397 (7th Cir.1996), and as the district court was in a better position than we are to judge the juror's expression, we do not find that determination to be clearly erroneous.

■ The prosecutor next challenged Juror No. 11, another African–American woman, and James made a *Batson* challenge. The government's reason was the one it gave when it challenged her for cause, that her brother had been involved with cocaine, and the court allowed the strike, although it did comment on the fact that the government's first three challenges had been to African–Americans. It stated, "It seems to me that now we certainly have to look a little harder at any challenges you make because now we're beginning to see a pattern." The prosecutor again mentioned to the judge that he did not intend to strike two African–American jurors, which the court dismissed as irrelevant, saying "I don't see how it has any bearing. It is not a question of who you don't strike. You are saying, Oh, I'm a good boy, I didn't strike this one."

Juror No. 26, a white man who had indicated some support for the drug legalization movement, was the government's next peremptory strike. The prosecutor then chose Juror No. 18, an African–American woman whose cousin had been a drug user, for his next strike. The court considered the reason given to be race-neutral.

Next, the government challenged Juror No. 20, an African–American man who had two cousins convicted of drug-related crimes. After James again objected, raising *Batson,* the court allowed the strike, because the reason given was race-neutral. The court did acknowledge that the fact that five of the prosecutor's six challenges were to African–

caine offense, and Juror No. 20 because his cousins had been involved with drugs. Juror No. 26, a white male, was also challenged for cause because he had said that sometimes he thought

drugs should be legalized. The court denied all three for-cause challenges because the jurors had all said they thought they could be fair and impartial.

Americans would seem to indicate a pattern, but that as the last two had had relatives involved with drugs, he would allow the strikes. The prosecutor used his last peremptory challenge to strike Juror No. 36, a white male.

██ James declares that although the prosecutor gave race neutral reasons for his strikes, the fact that five of his seven attempted strikes were to African–Americans indicates that his reasons were "mere pretenses designed to mask purposeful, racial discrimination." *Chandler*, 12 F.3d at 1432. We find, however, that the district court's decisions to grant the prosecutor's peremptory challenges were proper. "To survive a *Batson* challenge, unlike a challenge for cause, a peremptory strike need not be based on a strong or good reason, only founded on a reason other than race or gender." *United States v. Brown*, 34 F.3d 569, 571 (7th Cir. 1994). In addition, "unless a discriminatory intent is inherent in the government's explanation, the reason will be deemed race-neutral." *United States v. Canoy*, 38 F.3d 893, 898 (7th Cir.1994). Of the prosecutor's six successful strikes, four were of African–Americans, and of those four, three had relatives who had been involved with drugs in some way. As this case involved drugs, the prosecutor had a legitimate concern that these particular jurors may have sympathized with the defendant to the extent that they may have been reluctant to convict even when the evidence supported a conviction. Because those are legitimate, race-neutral concerns, and do not seem to be "mere pretenses," the court did not clearly err in allowing the strikes.

██ We are, however, concerned with what seems to be a misinterpretation of the purpose and reason behind *Batson* on the prosecutor's part, although it does not change our finding in this case. The district court correctly interpreted the law when it decided to grant or deny the peremptory strikes. The court also properly corrected the prosecutor's mistaken interpretation of *Batson*, which does not hold that a prosecutor can strike as many African–Americans as he wishes as long as he leaves one or two on the panel. Nor does *Batson* say that a pros-

ecutor can give any reason he likes for striking one African–American juror as long as he claims that he won't strike another. *Batson* demands that a prosecutor give a race-neutral reason every time he wants to peremptorily challenge an African–American person from the jury, no matter how many African–Americans remain.

### III.

██ Next, James challenges the method the district court used to estimate the amount of drugs involved in the Lockett–James conspiracy in order to calculate his sentence. We review the district court's calculation of the quantity of drugs attributable to James for clear error. *United States v. Taylor*, 72 F.3d 533, 542 (7th Cir.1995). We will reverse "only if, after reviewing the entire evidence, we are left with the firm and definite conviction that a mistake has been made." *United States v. Corral–Ibarra*, 25 F.3d 430, 437 (7th Cir.1994).

██ The government must prove an amount of drugs attributable to a defendant by a preponderance of the evidence. *United States v. Garcia*, 66 F.3d 851, 856 (7th Cir. 1995). The defendant has the right to be sentenced on the basis of reliable information. *United States v. Lanterman*, 76 F.3d 158, 160 (7th Cir.1996). In other words, the facts on which the court bases the sentence must have "sufficient indicia of responsibility to support its probable accuracy." *United States v. Salinas*, 62 F.3d 855, 859 (7th Cir. 1995). In this case, the government only needed to prove by a preponderance that the quantity of drugs exceeded 500 grams in order for James to receive an offense level of 36 under U.S.S.G. § 2D1.1(a)(3) and (c)(4).

The information that the district court used in calculating the amount of drugs to attribute to James consisted of testimony by Virgil Lockett that he received 30.6 ounces (867.31 grams) of cocaine from James and the weights indicated on the Express Mail packages sent from James to Lockett. It is the court's use of this last bit of information that James challenges. Because the government had only retrieved the last package sent by James to Lockett, it was unable to

determine the exact quantity of drugs in the other six packages. However, the government did know that the total combined weights of all seven packages was 52.50 ounces, because those figures were recorded on the mailing labels. The government also knew that the weight of cocaine in the last recovered package comprised approximately 71 percent of the package's total weight. If the weight of the cocaine in each of the packages was 71 percent of the total weight, then the total amount of cocaine could be approximated at 36.56 ounces (1036.47 grams). The court noted that even if it figured the weight of the cocaine to be 50 percent of the total weight, it would still come to be more than 500 grams. Therefore, the court, considering this and Lockett's testimony, concluded that either way, the amount of drugs involved exceeded 500 grams, and so it assigned James an offense level of 36.

James claims these numbers are random, unfair, vague and arbitrary, and says he should be sentenced only on the basis of the drugs found in the last package, because there had been no proof that any of the other packages contained drugs, aside from Virgil Lockett's testimony. The court was entitled to believe that testimony, however. In addition, the court's reliance on the estimates of drug quantities was not improper, see *Garcia*, 66 F.3d at 859; *United States v. Duarte*, 950 F.2d 1255, 1265 (7th Cir.1991) (as long as "nebulous eyeballing" is avoided, "factual determinations under the Guidelines need not emulate the precision of Newtonian physics."). We find that the court's determination of James' offense level at 36 was not clearly erroneous.

### IV.

James also appeals the court's refusal to grant him a sentence reduction for being a minor or minimal participant pursuant to U.S.S.G. § 3B1.2. We review this decision for clear error. *United States v. Agee*, 83 F.3d 882, 888 (7th Cir.1996).

U.S.S.G. § 3B1.2 provides for a 4–level reduction for a minimal participant, which the Commentary defines as one who is "plainly among the least culpable of those involved in the conduct of a group … [whose] lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant." The Commentary defines a minor participant as "any participant who is less culpable than most other participants, but whose role could not be described as minimal," and § 3B1.2 provides for a 2–level reduction for minor participants. A 3–level reduction is permitted for cases where the defendant comes between being a minimal and a minor participant. James has asked for any one of these three reductions.

James points to Lockett's involvement in a Florida drug ring, noting that James had no knowledge of or involvement in that endeavor, to bolster his claim that he was but a minimal participant in Lockett's larger drug scheme. James also claims that the credible evidence at trial showed that all he did was address the packages that were sent to Lockett, and he characterizes as unbelievable Lockett's testimony that James was more involved.

We find the court's reasoning to be more persuasive, however. It noted,

it seems to me from the evidence I heard in this case that, given that the jury has found Mr. James guilty, that he could not be classified in any way different than Mr. Lockett. He certainly played a major role in this whole—he had to obtain the drugs from someplace. Someone had to bring them to him or he had to participate in the mailing. The money was mailed back. All the way through this thing he was certainly participating—I don't want to say as an equal partner, but certainly approaching an equal participant on the same level as Mr. Lockett.

The district court's decision to deny James' request for a § 3B1.2 adjustment was not clearly erroneous.

### V.

James' final argument is that the disparity under the Sentencing Guidelines between the sentences for crack cocaine and for powder cocaine is discriminatory. We have rejected

similar claims, as James acknowledges, and so we need not further address this one. *See United States v. Booker*, 70 F.3d 488, 492–94 (7th Cir.1995), cert. denied, —— U.S. ——, 116 S.Ct. 1334, 134 L.Ed.2d 484 (1996).

The district court's rulings are AFFIRMED.