151 F.3d 1034
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
United States of America, Plaintiff-Appellee,
v.
Akinola A. MUSTAPHA, Defendant-Appellant.
 No. 97-2095.
 United States Court of Appeals, Seventh Circuit.
 Argued April 29, 1998.
Decided May 20, 1998.
 
 Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 93 CR 908 James B. Zagel, Judge.
 Before Hon. JESSE E. ESCHBACH, Hon. JOEL M. FLAUM, Hon. DIANE P. WOOD, Circuit Judges.
 
 ORDER
 
 1
 Akinola Mustapha, a Nigerian who has resided in the United States since January 1990, was convicted after a jury trial of conspiring to possess with intent to distribute 7.765 kilograms of heroin in violation of 21 U.S.C. § 846. This appeal concerns the sentence Mustapha received, and more particularly whether the district court erred in refusing to find that he was a minor or minimal participant in the offense for purposes of U.S. Sentencing Guideline § 3B1.2, and thus entitled to have his offense level reduced by at least 2 levels. We review determinations under § 3B1.2 for clear error only. United States v. James, 113 F.3d 721, 731 (7th Cir.1997). Taking into account the adjustment the district court made in the quantity of drugs for which it was holding Mustapha responsible, see U.S.S.G. § 1B1.3, which Mustapha has not directly challenged here, we conclude that the district court had a sound basis for finding that Mustapha was not a "minor participant," and we affirm the sentence.
 
 
 2
 Mustapha was a participant in a larger conspiracy to import heroin from Indonesia into the United States. The courier for the shipment in question was a woman named Rose Brawner. While staying at a hotel in Bali, Indonesia, Brawner was given a suitcase that contained the 7.765 kilos of heroin in ten separately wrapped packages. She flew from Bali to Tokyo, and then on to Seattle, Washington, where she was apprehended by federal agents. The agents had been tipped off to the illicit character of her trip through a wiretap that the Federal Bureau of Investigation had installed on the telephone of Abiodun Adeleke Ogunjobi, in Chicago. Through this wiretap, the agents had listened to literally thousands of telephone calls, many of which related to the heroin conspiracy.
 
 
 3
 Upon her arrest, Brawner agreed to cooperate with the agents. She told them that she was supposed to fly on to Chicago, where she would deliver the heroin to certain individuals whose names she did not know, but whose description she had been given. Now under the surveillance of the federal agents, she proceeded with her flight. When she arrived at O'Hare Airport in Chicago, about fifteen agents were spread throughout the airport awaiting her, and more importantly, looking out for the people she was to meet.
 
 
 4
 Mustapha entered the story at this point. The agents had (among others) four people under observation: two who were watching Brawner's gate, who followed her to the baggage claim area, and who eventually went outside. Outside, Brawner and the woman who had met her headed toward an orange Datsun where two other people were waiting. Brawner and her companion were arrested as they put the bag into the car. Near the Datsun was a gold Acura with two men in it: Moses Soetan and Mustapha. U.S. Customs Agent Paul Manke had been watching the Acura, which had driven a couple of times through the terminal areas before parking outside Terminal 2 for nearly 40 minutes. Manke saw another man approach the car and speak briefly with the two occupants.
 
 
 5
 As Brawner was being arrested, Manke and two other agents went over to the Acura. They asked for identification from each man. Soetan gave them an Illinois state identification card and Mustapha gave them an ATM card with the name Akinola Mustapha and an account number imprinted on it. Under questioning, the two gave what can charitably be called an unconvincing account of their activities. Mustapha said he was at O'Hare to pick up his sister Debra, who was coming in from Nigeria. He admitted that he did not know her airline, or her flight number, or when her flight was due. Manke asked whether Mustapha knew any of the people in the Datsun, and Mustapha said no. Manke next asked whether Mustapha knew the individual who had approached his car, and Mustapha denied that anyone had done so. Mustapha also told them that the car belonged to his cousin, but he gave an incorrect address for the cousin's apartment.
 
 
 6
 Although Mustapha's voice had not turned up on the wiretap very often before the Brawner arrest, he made a number of incriminating comments in the days following the arrest. The day before the arrest, he told someone that "the person" (meaning Brawner, the government suggested) was set to leave that day. Speaking a day or so later in the Yoruba dialect, a Nigerian language, Mustapha said that he entered the conspiracy when his friends put up enough money for him to purchase "one door opener." The parties disputed what the correct English translation of this phrase was at the trial. Mustapha claimed it meant "doorknob," which would correspond to about 50 grams of heroin; the government argued it was an allusion to the word "key," which was slang for a kilogram.
 
 
 7
 At the sentencing hearing, the district court rejected Mustapha's interpretation of the Yoruba words and decided to hold him accountable for at least one, but not more than two, kilograms of heroin. The court based its quantity determination on four factors: the structure of the transaction, the number of people involved, the level of involvement Mustapha displayed, and the significance of the statement Mustapha made: "... we got involved because we were broke ... But anyway, if it had worked ... I would have been laughing now." With respect to this one plus kilogram stake, the court found that Mustapha was not a minor or minimal participant and it sentenced him to 97 months in prison (the low end of the 97 to 121 month range for a level 30 offense, criminal history category I).
 
 
 8
 In his brief, Mustapha complains only that the district court clearly erred when it denied him an adjustment under § 3B1.2 for his minor or minimal role in the offense. He stresses that his voice appears on only one telephone call before the delivery of the heroin, out of literally thousands the agents intercepted. He points out that he personally put up no money, but instead his friends chipped in funds for him. The reason for his presence at the airport was not even clear, other than the fact that it may have shown that he drove another co-conspirator out there. On these facts, he urges, it was clear error for the district judge to deny the adjustment.
 
 
 9
 Mustapha would have been entitled to the minor role reduction only if he could show that he was substantially less culpable than most of the other participants in the conspiracy. United States v. McClinton, 135 F.3d 1178, 1190 (7th Cir.1998). More particularly, he must show that he was substantially less culpable with respect to the crime for which the district court was holding him responsible in sentencing, even if he was a bit player in the broader conspiracy that led to the charges. See United States v. Brown, 136 F.3d 1176, 1185 (7th Cir.1998); United States v. Burnett, 66 F.3d 137, 140 (7th Cir.1995). Here, the district court's first step was to focus on the amount of heroin that was fairly attributable to Mustapha--another determination, we note, that would have been subject to clear error review if Mustapha had challenged it here. The court found that he was responsible only for one to two kilograms of heroin, not for the full 7.765 kilograms. Our task is therefore to decide whether the district court clearly erred in finding Mustapha ineligible for the § 3B1.2 adjustment on that smaller quantity.
 
 
 10
 While we do not disagree with Mustapha that the facts supporting his connection to the smaller quantity of heroin are subject to dispute, that finding virtually precludes a conclusion that the district court clearly erred in choosing one view of the case. Mustapha's ambiguous remarks about a "door opener" after Brawner was seized, taken together with his other post-arrest comments, can be interpreted as showing that he had a significant role in the conspiracy, not a minor one. Although this is not dispositive, we note also that if the district court had attributed the full 7.765 kilogram amount to Mustapha, his offense level under the Guidelines would have been a 34. If the judge had then found him to be a minor participant in the broader conspiracy (as opposed to a minimal participant or something falling between those two), his offense level would have been reduced by 2 notches down to the 32 that was required for an amount of at least one kilogram but less than three kilograms. See generally § 2D1.1(c)(3), (4). It is inconceivable on this record that we would have found clear error in the judge's choice of the "minor" participant characterization instead of the "minimal" degree.
 
 
 11
 In any event, approaching the case as the district court did, the record supports a finding that Mustapha knew about the scope and structure of the heroin transaction in which Brawner was engaged. See U.S.S.G. § 3B1.2, comment (n.1). The court was entitled to resolve the linguistic dispute about the Yoruba words Mustapha used and how they translated into English drug slang, against Mustapha. We therefore AFFIRM the sentence imposed by the district court.