**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Montez D. JACKSON, Defendant–Appellant.**

No. 98–2025.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1999.

Decided Aug. 24, 1999.

Suzanne M. Garrison (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Steven P. Kaiser (argued), Evanston, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

On November 6, 1997, the defendant-appellant, Montez D. Jackson ("Jackson"), was convicted in the United States District Court for the Southern District of Illinois of two counts of distribution of crack cocaine and one count of possession of crack cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The defendant appeals his conviction and sentence for possession of crack cocaine with intent to distribute. We affirm.

## I. BACKGROUND

In March of 1997, a confidential informant ("informant") contacted Agent Anthony Mino ("Mino") of the East St. Louis Police Department. Although Mino was employed by the East St. Louis Police Department, he was assigned to an Illinois State Police unit known as the Metropolitan Enforcement Group of Southwestern Illinois, which is made up of Illinois State Police officers and local law enforcement officers temporarily assigned to work on undercover drug investigations. Agent Mino reported for work daily at Illinois State Police headquarters in Springfield, Illinois. The informant advised Agent Mino that the defendant Jackson was engaged in narcotics distribution and sales and offered to introduce Mino to Jackson for the purpose of making undercover drug purchases. Mino referred the informant to Sergeant Brian Latham ("Latham"), supervisor of the East St. Louis Metropolitan Enforcement Group of Southwestern Illinois office, to arrange the narcotics purchases.

On April 4, 1997, Latham and Mino met with the informant in Jones Park in East St. Louis to formulate a plan to purchase narcotics from the defendant Jackson. Later the same day, the informant and Latham met with Jackson at the informant's house. Latham advised the defendant that he was interested in purchasing a half-ounce of crack cocaine, and after the defendant handed Latham a rock of crack cocaine weighing 2.6 grams, Latham gave him $200. Five days later, on April 9, 1997, Latham again went to the informant's house where Jackson gave him 11.2 grams of crack cocaine for $400.

Several days later, Lieutenant Henry Williams ("Williams") of the East St. Louis Park Division Police Department, while on night patrol in Halls Park in East St. Louis, observed the defendant Jackson driving a light brown Pontiac Parisian and noted that Jackson's rear license plate light was nonoperational. Accordingly, Williams conducted a traffic stop. During the stop and interview, Williams became aware of the fact that the defendant's driver's license had been revoked and that the Pontiac he was operating was not registered to Jackson, but to another person named Lynette Hawkins ("Hawkins"). Williams did not cite the defendant for driving without a license at this time, but released him and returned to police headquarters to review Jackson's driving rec-

ord. Late in the evening of June 13, 1997, Williams saw the defendant Jackson driving the same Pontiac in Halls Park after the park had closed. Williams stopped Jackson, who was accompanied by an unidentified female, and questioned the defendant and his companion as to why they were in the park after hours. After conducting a field interview, Williams released Jackson. Three days later, on June 16, 1997, Williams pulled the defendant over in Halls Park for operating the Pontiac while his driver's license was revoked. This time, the defendant was accompanied by Darrell Merit ("Merit"). After checking with police headquarters, the officer was informed that the defendant's driver's license was still classified as revoked, and Jackson was placed under arrest for driving without either a valid license or insurance and was advised of his *Miranda* rights. Williams placed Jackson in the back seat on the driver's side of his squad car. Chief Levoy Perry ("Perry"), Williams's supervisor, and Detective Ken Berry ("Berry") of the East St. Louis Police Department were called and arrived on the scene shortly thereafter. When the defendant learned that Berry, a member of the police narcotics division, had arrived, he asked: "What is he doing here? I don't do drugs." Lieutenant Williams, Detective Berry, and Chief Perry proceeded to perform an inventory search of the vehicle prior to conveying the vehicle to the police station to impound it, pursuant to the standard operating procedures of the East St. Louis Police Department. After checking the passenger compartment, Perry opened the trunk and he, Berry, and Williams discovered what they believed to be crack cocaine in a plastic bag in the trunk.[1] As a member of the narcotics division, Berry assumed control of the crime scene, arrested Merit for possession of a controlled substance, and told Jackson that he was also under arrest for possession of a controlled substance. Berry handcuffed Mer-

it's hands behind his back and placed him in the backseat of his squad car behind the driver. Williams moved Jackson from his squad car to the rear seat of Berry's squad while Jackson's hands were cuffed behind his back. Berry then conveyed Jackson and Merit to police headquarters. After arriving with the subjects at the station, but before entering the same for booking, Berry searched the back seat of his patrol car, as he was required to do after transporting prisoners in his vehicle, and found a clear plastic vial containing 4.2 grams of crack cocaine underneath the squad car seat where Jackson had been.

The following day, June 17, 1997, Detective Delbert Marion ("Marion") removed the defendant Jackson from his cell and advised him of his *Miranda* rights for the purpose of getting a statement. Jackson told Marion that he would not make a statement unless a lawyer was present, and Marion returned Jackson to his cell. The next day, Mino visited the East St. Louis Police Department and noticed that Jackson's name was on the previous day's arrest sheet. Berry told Agent Mino that when Jackson was stopped for a traffic violation on June 16, 1997, cocaine was found in his car. Mino asked Berry if he could speak with the defendant about Mino's ongoing investigation stemming from the two earlier drug sales in April of 1997. Berry agreed and brought the defendant to an interview room where Mino was waiting. Prior to the interview, Jackson signed a department form which set forth his *Miranda* rights. The form, in part, provided that Jackson had been advised of his constitutional rights "and fully understanding these, [he] waive[d] them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity."

During the interview, Mino identified himself as a Metropolitan Enforcement

---

1. A forensic scientist testified that the bag in the trunk contained 1.6 grams of crack cocaine.

Group of Southwestern Illinois narcotics agent and explained to Jackson that he was not concerned with any of the details of Jackson's arrest of June 16, 1997. Mino also advised Jackson that he was the subject of an ongoing drug investigation and that he (Mino) had knowledge that he had sold crack cocaine on two separate occasions to an undercover officer.[2] Mino also told the defendant that he was not interested in obtaining any statement from him and that he was a "little fish" who could help the police catch his supplier. Mino allegedly told Jackson: "I am coming to you to see if you would like to assist in different avenues of investigation that [you] could help us on. That was as far as the conversation went." Mino gave the defendant his pager number and told the defendant to call him if he was interested in cooperating after his release from jail. The defendant stated that he would call Mino upon his release. Mino's conversation with defendant lasted approximately twenty minutes. Mino exited the interview room and told Berry that he was finished. As Berry escorted the defendant back to his cell, Jackson mentioned to Berry that after speaking to Mino, he realized "that he was in a lot of trouble. He stated that he wanted to clear up an earlier matter of the traffic stop in the park." Jackson proceeded to tell Berry about the June 16 traffic stop, and Berry took notes.

During the ensuing conversation, the defendant volunteered information to Berry concerning the June 16 traffic stop, none of which related to Mino's narcotics distribution investigation. Jackson stated that the bag of crack found in the trunk of Hawkins's car was his and took responsibility for placing the cocaine vial beneath the seat of the squad car. After reducing Jackson's statement to Berry to a typewritten document, Berry asked Jackson to read it and to feel free to change anything in it with which he disagreed. The defendant read and signed the statement with-

out making any changes. The statement form also contained a short recitation of Jackson's constitutional rights, which the defendant initialed. The form provided, in part:

> I have the right to remain silent and ... I do not have to make a statement, answer an [sic] questions or talk to anyone nor answer any questions directed to me; I further have been advised that anything I say or any statement I give can and will be introduced into evidence in Court against me; I have been further advised that if I want an attorney to be present at this time or anytime hereafter, I am entitled to such attorney, and that if I cannot afford to pay for an attorney that an attorney will be furnished to me if I so desire, and that if I do desire an attorney I do not have to make any statement or answer any questions until such time as an attorney has consulted with me. Having been advised of these rights as above, I hereby voluntarily agree to make a statement and answer questions asked of me and I waive my right to have an attorney as above set forth. I further state that I have not been threatened or mistreated in any fashion nor have any promises of leniency been made to me in return for making this statement.

Thereafter, Jackson posted bond on his traffic tickets and was released. Jackson paged Mino and told him that he was not going to assist him at this time in his investigation.

On September 3, 1997, United States Marshals arrested Jackson for possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841(a)(1). As he was arrested, Jackson commented that he may have sold the police "dope," but he did not sell as much as reflected in the police report. Prior to his trial, the defendant filed motions to suppress the crack cocaine found in the trunk of the Pontiac and the crack cocaine found under the backseat of

---

**2.** Mino never informed Jackson of how he knew Jackson had sold crack to undercover police officers or when the transactions occurred.

Berry's squad, as well as his statement of June 18, alleging that such evidence was obtained in violation of his Fifth Amendment rights. The trial judge denied the defendant's motions to suppress, ruling that

> there was no showing made of an expectation of privacy by the defendant in the car that he was driving .... Moreover, the defendant has conceded that he has no standing to contest the search, so I deny the motion as it applies to the suppression of the items seized as a result of the inventory search.

With respect to the June 18 statement, the trial judge noted:

> [W]hen the defendant was brought up at the request of Detective Mino, he was ... given his rights. With respect to the conversation with Mino, there was no interrogation shown to have been conducted by Mino, nor a functional equivalent of an interrogation. Mino was not trying to get the defendant to confess, but rather to cooperate .... There was also no interrogation initiated by Berry .... It is clear also that the defendant was given his constitutional rights in this case probably more times than most defendants .... The interview with Detective Berry was initiated by the defendant and was voluntary in nature and it also did not violate the defendant's rights, so I deny the motion to suppress.

On November 6, 1997, the defendant was convicted in the United States District Court for the Southern District of Illinois of two counts of distribution of crack cocaine, stemming from the two sales of cocaine to an undercover police officer in April of 1997, and one count of possession of crack cocaine with intent to distribute, stemming from the traffic stop in June of 1997, all in violation of 21 U.S.C. § 841(a)(1). At Jackson's sentencing hearing, the trial judge determined that the defendant had twenty criminal history points, placing him in a criminal history category of VI. Jackson's presentence re-

port revealed that the defendant's relevant conduct consisted of 19.6 grams of crack cocaine, resulting in an offense level 26 and a sentencing range of 120 to 150 months. The trial judge determined that the sentencing guidelines and the criminal history category "[did] not adequately reflect the defendant's criminal history" and granted the Government's motion for an upward departure, increasing the offense level to 27. The district judge imposed a sentence of 162 months imprisonment on Counts 1, 2, and 3 to run concurrently with each other, as well as a term of six years supervised release on Count 1 and a term of eight years supervised release on each of Counts 2 and 3, all to run concurrently.

## II. ISSUES

On appeal, we consider the following three issues: (1) whether the district court properly denied the defendant's motion to suppress the crack cocaine that was recovered from the trunk of the car driven by the defendant at the time of the arrest; (2) whether the district court properly denied the defendant's motion to suppress the defendant's statement made while in custody after he invoked his right to remain silent and requested an attorney; (3) whether the district court erred by departing upward in sentencing the defendant under 21 U.S.C. § 851.

## III. DISCUSSION

### A. Crack Cocaine Recovered from the Trunk of Jackson's Car

■■■ This Court reviews a district court's legal determinations made with respect to a suppression ruling *de novo* and reviews factual determinations under the clearly erroneous standard. *See United States v. Schwensow*, 151 F.3d 650, 658 (7th Cir.1998). "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *United States v. Torres*, 32 F.3d 225, 229 (7th Cir.1994) (internal quotations and citation omitted). "It has long been the rule that a

defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *Id.* at 229–30 (quoting *United States v. Padilla*, 508 U.S. 77, 81, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993)). With respect to searches of automobiles, in order for a defendant to establish that he has standing to claim that his Fourth Amendment rights were violated, he must demonstrate that he had a legitimate expectation of privacy in the vehicle he was driving at the time of the search. *See Torres*, 32 F.3d at 230 (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Furthermore, this Court has previously recognized that a driver who does not own the vehicle he is operating may still possess standing to challenge a search of the vehicle, *see United States v. Garcia*, 897 F.2d 1413, 1419 (7th Cir.1990), but only if the driver presents evidence showing that he has a legitimate expectation of privacy in the area searched. *See Torres*, 32 F.3d at 230.

 In the factual situation under consideration, the record demonstrates that the defendant failed to provide the police with any information, much less evidence establishing that he had a legitimate expectation of privacy in the Pontiac. Furthermore, the defendant at trial conceded that he lacked standing to contest the search. On appeal, the defendant, for reasons unexplained, ignores and seems to forget his concession in the trial court that he had no standing to contest the search, and instead argues that the search was not justified despite the inventory exception to the search warrant requirement, which allows police to search vehicles prior to impoundment so as to prevent false claims of loss of property or vehicular damage. The defendant did not argue before the district court that the search was not justified, and arguments not presented to the trial court during suppression hearings are waived on appeal and may be reviewed only for plain

error. *See United States v. Thomas*, 11 F.3d 1392, 1397–98 (7th Cir.1993). To reach the level of plain error, the district court's alleged error would have to " 'affect[ ] substantial rights' " and " 'seriously affect[ ] the fairness, integrity or reputation of judicial proceedings.' " *United States v. Newman*, 148 F.3d 871, 874 (7th Cir.1998) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993)).

In *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976), the Supreme Court held that warrantless inventory searches of impounded vehicles by authorities pursuant to a standard police policy or procedure do not violate the Fourth Amendment. *See also Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *United States v. Velarde*, 903 F.2d 1163, 1165 (7th Cir.1990); *United States v. Kordosky*, 878 F.2d 991, 993 (7th Cir.1989). The Court identified three bases for permitting inventory searches: to protect the owner's property while it remains in police custody; to protect the police against claims or disputes over lost or stolen property; and to protect the police and the public from potential danger. *See Opperman*, 428 U.S. at 368–69, 96 S.Ct. at 3096–97.

> A warrantless inventory search is constitutionally permissible if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search satisfies the fourth amendment standard of reasonableness, i.e., it is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures.

*Velarde*, 903 F.2d at 1165 (internal citation omitted).

 Jackson concedes that he was lawfully under arrest for driving with a revoked license at the time of the search. Therefore, we need direct our inquiry only towards the reasonableness of the inventory search.

"Whether a search and seizure is reasonable within the fourth amendment depends on the facts and circumstances of each case ..." *Cooper v. California,* 386 U.S. 58, 59, 87 S.Ct. 788, 790, 17 L.Ed.2d 730 (1967). In determining the reasonableness of an inventory search, we must be careful to balance the intrusion on the individual's fourth amendment rights against the promotion of legitimate governmental interests. *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). "The expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Opperman,* 428 U.S. at 367, 96 S.Ct. at 3096. As a result, when an inventory search is carried out "in accordance with *standard procedures* in the local police department, [it] ... tend[s] to ensure that the intrusion [is] limited in scope to the extent necessary to carry out the caretaking function." *Id.* at 375, 96 S.Ct. at 3100.

*Id.* at 1165–66. Thus, the crack cocaine discovered during the inventory search of the vehicle was discovered pursuant to a constitutionally valid warrantless search (the police inventory search) after the defendant was lawfully under arrest.[3] Furthermore, Lieutenant Williams testified that the officers conducted the inventory search pursuant to East St. Louis Park District Police procedures, and such a procedure is part of the government's "community caretaking function[ ], totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Velarde,* 903 F.2d at 1167 (internal quotations and citations omitted); *see also Cady v. Dombrowski,* 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). It is well established that the inventory procedures "serve[ ] to protect the contents [of a vehicle] from damage, theft or vandalism while in the custody of the [police], to protect the [police] and the towing service

against claims of lost or stolen property, and to protect ... officers from potentially dangerous instrumentalities." *Velarde,* 903 F.2d at 1166. Under the facts of this case, as we have pointed out, any claim of privacy is outweighed by the substantial governmental interest involved in inventorying the contents of the trunk. Because the defendant failed to establish that he had a legitimate expectation of privacy in the Pontiac and because he raises arguments on appeal not raised at trial, we conclude that the trial court's ruling was correct.

**B. Statement Made While in Police Custody**

██ We next consider whether the trial court properly denied the defendant's motion to dismiss the statement he made to Detective Berry while in police custody. The defendant contends that after he was arrested for possessing a controlled substance and driving without a valid license, he was interrogated by police without counsel present despite his request for an attorney. The defendant later signed a written confession to the possession of narcotics charge stemming from the traffic stop on June 16, 1997. This Court reviews the district court's determination that custodial interrogation did not occur in this case *de novo. See United States v. James,* 113 F.3d 721, 726 (7th Cir.1997). However, any "historical" facts and credibility determinations are given deferential review because "the trial court is in the best position to judge a witness's credibility and demeanor." *Id.* (quoting *United States v. Yusuff,* 96 F.3d 982, 988 (7th Cir.1996), *cert. denied,* 519 U.S. 1134, 117 S.Ct. 999, 136 L.Ed.2d 878 (1997)).

With respect to Jackson's contention that his statement should have been suppressed because he alleged that it was obtained in violation of his Fifth Amendment rights, we initially address Jackson's argument that he was interrogated by Mino without counsel present, despite his

---

**3.** We reiterate that Jackson does not challenge the validity of his arrest.

request for counsel. At trial, Mino testified that during his meeting with the defendant on June 18, 1997, he explained to Jackson that he was not concerned with any of the details of the defendant's arrest on June 16, 1997, but advised him that he was the subject of an ongoing drug investigation. Mino told Jackson that he knew that he had sold crack cocaine on two separate occasions to an undercover police officer. Mino also made the defendant aware that he was not interested in obtaining a statement and that the defendant was a "little fish" who could help the police catch his supplier. Mino then gave the defendant his pager number and told him to call if he was interested in cooperating after his release from jail.

The Supreme Court has previously held that a person who is interrogated while in custody has the right to request the assistance of a lawyer. *See Miranda v. Arizona,* 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966). Interrogation under *Miranda* includes express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). For example, in *United States v. Payne,* 954 F.2d 199, 202 (4th Cir.1992), the Fourth Circuit determined that a declaratory statement made by a federal agent to a defendant that police had found a gun in the defendant's house did not constitute interrogation so as to require *Miranda* warnings. The court held:

> It remains for us to review the application of the *Innis* definition to the circumstances of this case. Appellant argues that Agent Martin's statement to him constituted interrogation under *Innis* because, from his position, "a statement that the police found a gun in his house called for an exculpatory response." We disagree. As the district

court found, Agent Martin's statement "was not one that sought or required a response." Officers "surely cannot be held accountable for the unforeseeable results of their words or actions," *Innis,* 446 U.S. at 301–02, 100 S.Ct. at 1690, and we cannot conclude that Agent Martin "should have known" that her statement, which was the only discussion of the charges or evidence against appellant, was "reasonably likely to elicit an incriminating response." *Id.* at 302, 100 S.Ct. at 1690. Moreover, [the defendant] "was not subjected to compelling influences, psychological ploys, or direct questioning." *Arizona v. Mauro,* 481 U.S. 520, 529, 107 S.Ct. 1931, 1936–37, 95 L.Ed.2d 458 (1987). Thus, we agree with the district court that the rather innocuous statement at issue here did not constitute interrogation and should not result in the sanction of suppressing relevant and probative evidence.

*Payne,* 954 F.2d at 203. Furthermore, in *Arizona v. Roberson,* 486 U.S. 675, 678, 108 S.Ct. 2093, 2096, 100 L.Ed.2d 704 (1988), the Supreme Court considered the circumstance in which a defendant had been arrested for burglary and requested counsel, but was then interrogated a second time concerning an unrelated burglary. During the second interrogation, the defendant made incriminating statements concerning the charged burglary. *See id.* The *Roberson* Court noted:

> The United States, as *amicus curiae* supporting petitioner, suggests that a suspect in custody might have "good reasons for wanting to speak with the police about the offenses involved in the [second] investigation, or at least to learn from the police what the [second] investigation is about so that he can decide whether it is in his interest to make a statement about that matter without the assistance of counsel." The simple answer [to this contention] is that the suspect, having requested counsel, can determine how to deal with the separate investigations with counsel's advice. Further, even if the police have

decided temporarily not to provide counsel, ... they are free *to inform the suspect of the facts of the second investigation as long as such communication does not constitute interrogation.*

*Id.* at 687, 108 S.Ct. 2093 (internal citation omitted) (emphases added).

█ In the case under consideration, Mino's statement to the defendant did not pertain to the crimes for which Jackson was charged—driving with a revoked license and possessing a controlled substance—but instead related only to the defendant's sales of narcotics to the undercover officer, Sergeant Latham, on April 4 and April 9, 1997. When Agent Mino explained to Jackson that he was the subject of an ongoing investigation and that he knew that the defendant had sold crack cocaine to the undercover officer on two occasions in April, he was "inform[ing] the suspect of the facts of the second investigation," *Roberson*, 486 U.S. at 687, 108 S.Ct. at 2101, and soliciting Jackson's assistance if he was willing to give it after he was released from jail. Mino also told the defendant that he had no interest in obtaining a statement from him. With respect to the constitutional claim that Jackson has raised concerning his interview with Mino, in view of the fact that Mino did not ask any questions of Jackson concerning the traffic stop on June 16, 1997, and since Mino advised Jackson of the fact that the only reason he was speaking with him was to solicit his help in an ongoing drug investigation after he was freed from jail, Mino's meeting with Jackson should not be considered an interrogation.

We next consider whether Jackson was improperly interrogated by Detective Berry and thus, whether the trial court erred in refusing to suppress Jackson's statement to Berry, which was made after Mino completed his interview on June 18, 1997. As Detective Berry led the defendant back to his cell, Jackson stated that he wished to speak with the police to discuss his arrests for driving with a revoked license

and possessing a controlled substance. According to Berry, Jackson "stated that he was in a lot of trouble. He stated that he wanted to clear up an earlier matter of the traffic stop in the park." Berry, in response to Jackson's request to meet with police, walked the defendant "over to [his] desk in the squad room." At this time, the defendant proceeded to tell Berry that the plastic bag of crack found in the trunk of Hawkins's car during the inventory search following the traffic stop belonged to him and that he was responsible for placing the plastic vial beneath the seat of the squad car. Berry never did refer to Mino's investigation of the drug sales to the undercover officer earlier in April.

█ "[A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) (emphasis added). After speaking with Mino on June 18, 1997, and as Berry was returning the defendant to his cell, Jackson personally requested that he be allowed to speak with the police in order that he might "clear up" the traffic stop. Obviously, as a result of Jackson's request to speak with the police to "clear up" the traffic stop, it was Jackson who "initiate[d] further communication." *Id.* Based upon all these facts and the statement made by the defendant, we hold that the district judge's action was proper in denying the defendant's motion to suppress the statement made to Berry because Jackson had initiated the communication after he had requested counsel.

### C. Sentence Departure

█ The defendant also contends that the trial court erred in departing upward from the Sentencing Guidelines during the sentencing hearing. The defendant did not challenge the Government's request for an enhanced sentence at trial, and ar-

guments not presented to the district court are waived on appeal and may be reviewed only for plain error. *See United States v. Newman*, 148 F.3d 871, 874 (7th Cir.1998). After the defendant was found guilty and before sentencing on the original charge, the Government filed a new information and sought a sentence enhancement based on the defendant's two prior state court felony drug convictions. 21 U.S.C. § 851(a)(1) provides that "[n]o person who stands convicted of an offense under [the offenses and penalties provisions of the drug abuse prevention chapter of the United States Code] shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty, the United States attorney files an information with the court ... stating in writing the previous convictions to be relied upon." Section 851(a)(2) provides: "An information may not be filed under this section if the increased punishment which may be imposed is imprisonment for a term in excess of three years unless the person either waived or was afforded prosecution by indictment for the offense for which such increased punishment may be imposed."

The defendant somehow argues that the waiver or indictment language of section 851(a)(2) refers not to a conviction for which the Government seeks enhancement, but instead to the prior convictions on which the enhancement is based. In other words, according to the defendant's interpretation of the law, the prior convictions, not the offense of conviction, must be prosecuted by indictment or waiver thereof. However, this Court has previously ruled that the language at issue, that "[a]n information may not be filed under this section if the increased punishment which may be imposed is imprisonment for a term in excess of three years unless the person either waived or was afforded prosecution by indictment for the offense for which such increased punishment may be imposed," refers to the conviction for which the enhanced sentence is sought, not to prior convictions. *See United States v.*

*Burrell*, 963 F.2d 976, 992–93 (7th Cir. 1992) (adopting reasoning of *United States v. Adams*, 914 F.2d 1404, 1407 (10th Cir. 1990), *cert. denied*, 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990)); *United States v. Espinosa*, 827 F.2d 604, 616–17 (9th Cir.1987), *cert. denied*, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988). *See also United States v. Harden*, 37 F.3d 595, 601 (11th Cir.1994) (adopting reasoning of *Burrell*, *Adams*, and *Espinosa*); *United States v. Trevino–Rodriguez*, 994 F.2d 533, 536 (8th Cir.1993) (same). Because the indictment and waiver language refers to the most recent offense and all the circuits that have ruled on this issue agree with our conclusion, the district court did not commit plain error in enhancing the sentence.

## IV. CONCLUSION

We hold that the district court properly denied the defendant's motions to suppress the crack cocaine found in the trunk of the Pontiac as well as the defendant's statement to Berry. Furthermore, the district court did not err by departing upward in sentencing the defendant.

AFFIRMED