# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1614

IKE EASLEY, JR.,

*Petitioner-Appellant,*

v.

SHELDON FREY,

*Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 7117—**Robert W. Gettleman**, *Judge.*

———————

ARGUED NOVEMBER 1, 2005—DECIDED JANUARY 11, 2006

———————

Before BAUER, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Robert Taylor, the superintendent at Illinois' Pontiac Correctional Center, was stabbed to death in his office on the morning of September 3, 1987. The murder weapon was a homemade knife—in prison parlance, a "shank." Ike Easley, an inmate at Pontiac, was tried and convicted of first degree murder and sentenced to death in connection with the crime. Later, his sentence was commuted to life in prison. He is here today appealing the denial of his petition for habeas corpus, *see Easley v. Hinsley*, 305 F. Supp. 2d 867 (N.D. Ill. 2004), filed pursuant to 28 U.S.C. § 2254.

We start with a brief recounting of the facts as determined by the Illinois Supreme Court when it resolved

Easley's direct appeal. *See People v. Easley*, 592 N.E.2d 1036 (Ill. 1992), *cert. denied,* 506 U.S. 1082 (1993); *see also Ward v. Hinsley*, 377 F.3d 719, 721 (7th Cir.), *cert. denied*, 125 S. Ct. 632 (2004) (state court's unrebutted factual determinations presumed correct).

At Easley's trial, inmate Lawrence Spillar testified that while he was visiting Superintendent Taylor, Easley "ran into the office, jumped on Taylor's desk and struck him in the face." Easley then "pulled a knife from his belt and appeared to stab Taylor." According to Spillar, a second inmate, Roosevelt Lucas, entered the office and struck Taylor with a pipe. Another witness, inmate Demetre Brown, saw Easley stab Taylor and also testified to seeing Easley and Lucas prepare for the murder by donning gloves and caps.

In addition to the inmate testimony, the Supreme Court recited other evidence of Easley's guilt. Correctional Officer Robert Baremore testified that he locked the inmates on "gallery five" in their cells immediately after the attack—Taylor's office was a converted inmate cell located on gallery five. Four other prison officials testified to seeing Easley near Taylor's office before the murder or locked in a gallery five cell after the murder, even though his assigned cell was in a different gallery. (One official did testify that "it was not unusual for inmates from other galleries to be near Taylor's office.") Technicians also recovered a bloody footprint from the scene matching Easley's shoe. Easley's fingerprint was found on the shank used to kill Taylor. Blood found on Easley's shoe and a pair of gloves removed from his cell, though, did not match Taylor's blood.

After the murder, corrections officers isolated and questioned approximately 30 inmates. The first round of

questioning lasted about 10 minutes per inmate.[1] A second round of questioning focused on fewer than the original 30 inmates, including Easley. Investigators Doug Read and David Brubaker advised Easley of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and he invoked his right to remain silent. After he refused to answer questions, investigator Gerald Long joined Read and Brubaker. Long, who acknowledged that Read and Brubaker told him that Easley had refused to answer questions, testified he said the following to Easley:

> 'I understand you have been given your rights and you don't wish to say anything, and I do not wish to ask you any questions at this time, but I want to advise you what lies ahead.' At that point in time, I advised him that we had inmate testimony that indicates that he and another individual were the hitters or perpetrators of the murder of Superintendent Taylor and that even though he was currently institutionalized on a serious matter this was more serious in the fact that it was a capital crime and if convicted, could be subject to the death penalty.

Easley responded, "all you honkey motherfuckers want is a nigger donkey to pin this case on, and I am your donkey, I am your killer."

Easley moved to suppress his response to Long. According to Easley, Long's statement was the equivalent of interrogation, which was constitutionally impermissible after he invoked his right to remain silent. The trial court, though,

---

[1] During the first round of questioning, Easley made statements to investigators that are not reported by the Illinois Supreme Court. He moved to suppress those statements because investigators did not advise him of his rights, and the trial court agreed. *See Easley*, 592 N.E.2d at 1043. Their suppression is not an issue in this appeal.

found that Easley's response was not "coerced" or the result of a "calculated strategem [*sic*]." Thus, the court reasoned, Easley's right to remain silent under *Miranda* was not violated, and the statement was received in evidence.

The Illinois Supreme Court, reviewing the denial of the suppression motion on direct appeal, analyzed whether *Michigan v. Mosely*, 423 U.S. 96 (1975), required suppression of Easley's response because investigators did not "scrupulously honor" his "right to cut off questioning." *Mosley*, 423 U.S. at 103 (quoting *Miranda*, 384 U.S. at 479, 474). The Supreme Court differed with the trial court, finding that Long's exhortation (after Read and Brubaker initially discontinued questioning) was an " 'obvious effort to persuade [the defendant] to make a statement.' " *Easley*, 592 N.E.2d at 1046 (quoting *People v. R.C.*, 483 N.E.2d 1241, 1244 (Ill. 1985)). But, the court continued, Long's statement did not itself "rise to the level of being the 'functional equivalent' of interrogation." *Easley*, 592 N.E.2d at 1047 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). The court observed that Long did not initially administer the *Miranda* warning, there was some separation in time between the initial warning and the time Long made his statement (though the court could not determine the lapse of time), and Long never asked Easley a question but only made a statement. Consequently, the Supreme Court affirmed the trial court's ruling admitting the response. Easley did not raise the issue again on postconviction review. *See People v. Easley*, 736 N.E.2d 975 (Ill. 2000).

The district court, reviewing Easley's *Mosely* claim, held that the Illinois Supreme Court did not unreasonable apply clearly established United States Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Relying on the standard articulated in *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003), and *Hardaway v. Young,* 302 F.3d 757, 762 (7th Cir. 2002), the district court found that "although the Illinois Supreme

Court's decision on this issue may have been incorrect, it was not objectively unreasonable." Finally, the district court found in the alternative, under *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), that the admission of Easley's response was harmless because it was not obviously inculpatory and there was overwhelming evidence of his guilt.

In this court Easley argues both that the Illinois Supreme Court erred when it determined that Long's statement was not a form of interrogation and that the district court wrongly determined that, even if a *Miranda* violation occurred, the admission of his response was harmless. We review the district court's decision to deny relief *de novo. See Walker v. Litscher*, 421 F.3d 549, 554 (2005).

Easley faces a difficult standard of review. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we cannot grant relief unless the state court's adjudication of Easley's constitutional claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *See* 28 U.S.C. § 2254(d)(1). "Even if the state court erroneously applied federal law, we may only grant the writ if the decision was objectively unreasonable." *See Walker*, 421 F.3d at 554.

We begin by reviewing the Supreme Court's precedent regarding a suspect's invocation of his right to remain silent, which investigators must "scrupulously honor." *Miranda*, 384 U.S. at 479; *see also Mosely*, 423 U.S. at 104. In *Mosely*, the Court allowed police to initiate questioning regarding a murder after Mosely invoked his right to remain silent during an earlier interrogation focused on two robberies. *See Mosely* 423 U.S. at 105-06*, see also United States v. Schwensow*, 151 F.3d 650, 658-59 (7th Cir. 1998) (summarizing the Court's holding in *Mosely*). Officers first advised Mosely of his *Miranda* rights and questioned him

about two robberies but stopped after he invoked his right to remain silent. Later, a different police officer at a different location again advised him of his *Miranda* rights and questioned him about an unrelated murder. Mosely, without invoking his right to remain silent, implicated himself in the homicide and the Court upheld the introduction of his statement.

*Mosely* established a totality of the circumstances test for determining whether police have breached their duty to honor a suspect's right to remain silent. *See Schwensow*, 151 F.3d at 658. In *Schwensow*, we observed that the Court's analysis in *Mosely* included a consideration of "the amount of time that lapsed between interrogations; the scope of the second interrogation; whether new Miranda warnings were given; and the degree to which police officers pursued further interrogation once the suspect had invoked his right to silence." *Id.* at 658. But, *Mosely* "neither elevates any one factor as predominant or dispositive nor suggests that the enumerated factors are exhaustive, but instead directs courts to focus on whether the confession was obtained in a manner compatible with the requirements of the Constitution." *Id.* at 659 (internal quotation marks and citation omitted).

Following *Miranda* and *Mosely,* the Court addressed when a police officer's statement to a suspect, although not a question, is the "functional equivalent" of interrogation. *See Innis*, 446 U.S. at 301. Innis was suspected of robbing a taxi driver with a sawed-off shotgun but had no gun when he was arrested. After police officers took him into custody and notified him of his right under *Miranda*, he asked to see an attorney. Then, in Innis's presence, one officer remarked to another, "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves." Innis incriminated himself by revealing the location of the gun.

The Court defined the "functional equivalent" of interrogation as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301. The Court, explaining the nature of the inquiry, assigned significance to the intent of the police to elicit an incriminating statement:

> [The intent of the police] may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

*Innis*, 446 U.S. at 302 n.7. But, the Court "primarily" focused its analysis on the suspect's perception, *see also Whitehead v. Cowan*, 263 F.3d 708, 718 (7th Cir. 2001), and determined that the officer's statement in Innis's presence did not amount to interrogation.

The Court again addressed the role of a police officer's intent in *Arizona v. Mauro*, 481 U.S. 520 (1987). Confronted with a state supreme court determination that two officers who placed a husband and wife in an interrogation room with a tape recorder "both knew that . . . incriminating statements were likely to be made," the Court nevertheless determined that police did not violate the suspect's *Miranda* rights. The Court concluded that an interrogation did not occur simply because the police knew their actions were likely to result in a suspect volunteering incriminating statements.

We now turn to Easley's principal argument, that the Illinois Supreme Court erred by determining that Long's statement did not "rise to the level of being the 'functional

equivalent' of interrogation." According to Easley, the court's initial finding that Long's statement was made in an "obvious effort to persuade [the defendant] to make a statement" should have been dispositive under *Innis*, regardless of the other circumstances of the case.

Easley's argument is not persuasive. Long's intent to elicit a response from Easley may suggest that the statement could be a form of interrogation, but his intent is not dispositive, *see Mauro*, 481 U.S. at 529 n.6. Long's statement must also have been "reasonably likely to elicit an incriminating response." *Innis,* 446 U.S. at 301. Easley draws our attention to Long's mention of the death penalty but does not explain how this makes a *Miranda* violation more likely than not. Ultimately Easley can only prevail if he was subjected to "compelling influences, psychological ploys, or direct questioning." *Mauro*, 481 U.S. at 529.

In this case, we do not believe that Long's statement regarding the evidence and the possible consequences of the charges Easley faced rose to the level of interrogation under existing United States Supreme Court precedent. As the Fourth Circuit observed in *United States v. Payne*, "information about the evidence against a suspect may also contribute to the intelligent exercise of his judgment regarding what course of conduct to follow." 954 F.2d 199, 202 (4th Cir. 1992) (citation omitted); *accord United States v. Moreno-Flores*, 33 F.3d 1164, 1169-70 (9th Cir. 1994) (fact that police statements to suspect "may have struck a responsive chord" insufficient to find them functional equivalent of interrogation). The defendant in *Payne* invoked his right to counsel. Later, officers notified him of the charges he faced. The Fourth Circuit determined that "statements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect [do not] constitute interrogation as a matter of law." The court declined to reverse the trial court's admission of the defendant's statement because it could not "conclude that Agent

Martin 'should have known' that her statement, which was the only discussion of the charges or evidence against appellant, was 'reasonably likely to elicit an incriminating response.'" Like the Fourth Circuit, we do not believe that the provision of information, even if its weight might move a suspect to speak, amounts to an impermissible "psychological ploy." We have cited *Payne*'s reasoning approvingly, *see United States v. Jackson*, 189 F.3d 502, 510 (7th Cir. 1999), and *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994), and do so again today.

Easley has not suggested that Long's statement was anything more than a matter-of-fact communication of the evidence against him and the potential punishment he faced. Accordingly, we are not persuaded to hold that the Illinois Supreme Court misapplied or acted contrary to United States Supreme Court precedent when it determined that Long's statement was not the equivalent of interrogation. *See Jackson v. Frank,* 348 F.3d 658, 665 (7th Cir. 2003) (determination by sister circuit consistent with state court determination "makes it more difficult to conclude" state court "unreasonably applied Supreme Court authority"). And, because it was not a form of interrogation, the statement did not transgress the investigators' duty to honor Easley's invocation of his right to remain silent.

Moreover, even if Easley could convince us that Long's statement violated his rights under *Miranda*, we would not grant him relief because the introduction of his response could only be described as harmless error. Under *Brecht,* a habeas corpus petitioner must show that a *Miranda* violation had a "substantial and injurious effect or influence in determining the jury's verdict" in order to succeed on collateral review. *Brecht*, 507 U.S. at 623; *see also Hinton v. Uchtman*, 395 F.3d 810, 819-20 (7th Cir. 2005).

Easley argues that his response to Long was damaging because it was the only statement attributed to him that

the jury heard at trial. Because he exercised his right not to testify, the jury was, he suggests, particularly influenced by the "racially charged" statement which it viewed as an admission of guilt. We don't believe, however, that the response he uttered to Long can be so easily categorized. Recall, again, the statement: "All you honkey motherfuckers want is a nigger donkey to pin this case on, and I am your donkey. I am your killer." While one way of looking at this response is that it is an admission of guilt, another, and we think a more plausible interpretation, is that Easley was accusing the investigators of participating in a racist plot to frame him. It was a response born of frustration.

But even if the jury viewed the response as Easley posits, he is not entitled to relief as the evidence against him was powerful. Two eyewitnesses testified to seeing Easley stab Superintendent Taylor. Though Easley faults them for being members of a rival gang and thus incredible, the jury obviously accepted their testimony after cross-examination, and we will not disturb that assessment. *See Bieghler v. McBride*, 389 F.3d 701, 707 (7th Cir. 2004). The fingerprint and footprint evidence also linked Easley to the murder. Finally, five correctional officers placed Easley near Taylor's office before and after the murder. Faced with this evidence, under *Brecht*, the admission of his response to Long can only, at best, be harmless error.

AFFIRMED.

A true Copy:

    Teste:

                         _____

                         *Clerk of the United States Court of*
                             *Appeals for the Seventh Circuit*