COURT OF APPEALS OF VIRGINIA


Present:    Judges Humphreys, McClanahan and Senior Judge Willis
Argued at Chesapeake, Virginia


STEPHEN ANDREW ADDERLEY

                                              MEMORANDUM OPINION* BY
v.        Record No. 1318-08-1            JUDGE ELIZABETH A. McCLANAHAN
                                                    MARCH 16, 2010
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                          A. Joseph Canada, Jr., Judge

            Kevin E. Martingayle (Stallings & Bischoff, P.C., on briefs), for
            appellant.

            Donald E. Jeffrey, III, Senior Assistant Attorney General
            (William C. Mims, Attorney General, on brief), for appellee.


        Stephen Andrew Adderley appeals his convictions, upon a conditional guilty plea, of

possession of marijuana with intent to distribute, in violation of Code § 18.2-248.1, and

possession of a firearm as a convicted felon, in violation of Code § 18.2-308.2.  Adderley argues

the trial court erred in denying his motion to suppress incriminating statements he made to the

police shortly after his arrest.  The trial court found the statements were not the result of police

interrogation or its functional equivalent, and thus Adderley's rights under Miranda v. Arizona,

384 U.S. 436 (1966), were not implicated.  For the following reasons, we affirm the decision of

the trial court.

                                      BACKGROUND

        We review the evidence in the "light most favorable" to the Commonwealth as the

prevailing party below.  Commonwealth v. Hudson, 265 Va. 505, 514, 578 S.E.2d 781, 786

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(2003) (citations omitted). Virginia State Police Special Agent M. Wendel and Virginia Beach Police Detective G. Meador arrested Adderley outside his residence in Virginia Beach pursuant to an arrest warrant issued in Prince William County on a conspiracy charge involving the transportation of marijuana into Virginia by way of Adderley's alleged co-conspirator, C. Balthazar. Agent Wendel advised Adderley of his <u>Miranda</u> rights at the time of his arrest. Adderley responded by stating that he had never been to Prince William County and had "just traveled this past weekend up to New York." Adderley also stated "he was labeled a snitch because of a previous investigation." Agent Wendel asked Adderley if he wished to waive his <u>Miranda</u> rights, and "he elected not to do so." "Because of [Adderley's] refusal to waive his rights," according to Agent Wendel, "no further questions were asked." Agent Wendel then drove Adderley to the Virginia Beach magistrate's office while Detective Meador returned to Adderley's residence to participate in the execution of a search warrant for that location.

Upon arriving at the parking lot of the magistrate's office, Agent Wendel received a call from Detective Meador advising that the police had found a large bundle of marijuana and a firearm during their search of Adderley's residence.[1] Detective Meador then asked Agent Wendel "to hold off taking [Adderley] in [to the magistrate] because he was going to obtain additional warrants" on Adderley for drug and firearm related charges arising from the search of his residence.

Agent Wendel advised Adderley that the marijuana and firearm had been discovered, that, as a result, additional drug and firearm charges would be added to the pending drug conspiracy charge, and that he would wait for Detective Meador's arrival before taking Adderley to the magistrate for "processing." Adderley "immediately" stated "the gun was not loaded and

---

[1] Detective Meador advised that the contraband was actually located in the neighbor's attic where the firewall "had been knocked through" from Adderley's attic to the neighbor's attic in the adjoining apartment building.

he would never use it against anyone and that he only had it to scare people for his own protection because he was labeled or known as a, quote, snitch." Agent Wendel "reminded" Adderley that he had invoked his right to counsel and that Wendel "was not going to ask him any questions." Agent Wendel also "reminded" Adderley to "remain silent."

After remaining silent for approximately two to three minutes, Adderley stated to Agent Wendel that he had not seen or spoken to Balthazar in a long time. He said Balthazar's son owed him $5,000 that the son had stolen from Adderley. Adderley said that he found a key to Balthazar's auto business, and went there for the purpose of recouping his $5,000. He used the key to let himself in when he found the business closed. Adderley claimed that, when he did not find any money, he broke into the trunk of a car located at the business and "saw twenty pounds of marijuana just lying there so he took it because he smok[ed] marijuana and [knew] that it was worth more than $5,000." He stated that he then called Balthazar and told Balthazar "he had [Balthazar's] marijuana and would give it back once he got his $5,000 back." Adderley claimed that was why he had "Balthazar['s] marijuana."

At that point, Adderley stopped talking, and Agent Wendel again advised Adderley that he was not going to ask Adderley any questions because Adderley had not waived his right to counsel. Adderley then asked Agent Wendel what he "could do to make the gun charge go away." Again, Agent Wendel told Adderley that "since [Adderley] wanted an attorney [Wendel] was not going to do anything except write a report to the Commonwealth that [Adderley] did not want to further the investigation." Agent Wendel also explained to Adderley that when "someone cooperates" in an investigation Wendel passes along the information to the Commonwealth's Attorney, but that the prosecutor determines "what deals [are] to be made." Adderley did not make any further statements to Agent Wendel.

From the time they arrived at the parking lot of the magistrate's office, Agent Wendel and Adderley waited in Agent Wendel's car for approximately thirty-five minutes, at which time Detective Meador arrived. Detective Meador and Agent Wendel then took Adderley to the magistrate's office for "processing."

Adderley filed a motion to suppress his incriminating statements made to Agent Wendel, claiming the statements were the product of Agent Wendel's interrogation of Adderley, in violation of Adderley's rights under Miranda. In a letter opinion, the trial judge denied Adderley's motion upon finding that no Miranda violations had occurred. The trial judge found Agent Wendel "merely made a statement that evidence had been found and new charges would be brought against [Adderley]. The subsequent statements made by [Adderley] were unsolicited, and cannot be suppressed because they were not the result of police interrogation." The trial judge also found that Adderley's incriminating statements were not the product of the "functional equivalent" of a police interrogation, as defined in Rhode Island v. Innis, 446 U.S. 291 (1980). Adderley subsequently entered a conditional guilty plea on his drug and firearm related charges, preserving his right to appeal the ruling on his motion.

ANALYSIS

"In reviewing a trial court's denial of a motion to suppress, 'the burden is upon [the defendant] to show that the ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (quoting Fore v. Commonwealth, 220 Va. 1007, 1010, 265 S.E.2d 729, 731 (1980)). Further, while we are bound to "review *de novo* the trial court's application of defined legal standards to the particular facts of a case," we review its "findings of historical fact only for 'clear error.'" Rashad v. Commonwealth, 50 Va. App. 528,

534, 651 S.E.2d 407, 410 (2007) (quoting Shears v. Commonwealth, 23 Va. App. 394, 398, 477 S.E.2d 309, 311 (1996)).

In this case, Adderley was in police custody when he made his incriminating statements to Agent Wendel after being advised of, and then invoking, his Miranda rights. The only dispute, therefore, is whether those statements were the product of police interrogation that violated Adderley's constitutional privilege against compulsory self-incrimination and right to counsel, as safeguarded under Miranda and its progeny. See Innis, 446 U.S. at 300-01 ("[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."); Bailey v. Commonwealth, 259 Va. 723, 745, 529 S.E.2d 570, 583 (2000) ("Miranda warnings are implicated only during a custodial interrogation." (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

Challenging the trial court's ruling that his incriminating statements were, in fact, "unsolicited," and thus admissible, Adderley argues he was subjected to "dialogue that was calculated to elicit incriminating responses from him," in violation of his Miranda rights. More specifically, Adderley asserts that, "[p]redictably, when [he was] confronted with [information regarding the drugs and firearm discovered during execution of the search warrant at his residence and the resulting additional charges to be filed against him], . . . while seated handcuffed in a police vehicle in the parking lot of the municipal center, [he] broke down and began to talk." "This was a thinly veiled effort by law enforcement," Adderley argues, "to get around [his] request to speak with an attorney." Thus, Adderley concludes, the trial court erred in denying his motion to suppress those statements because they resulted from what amounted to an unlawful police interrogation. We disagree.

An accused, who has invoked his Miranda rights after being taken into custody, as here, is not subject to "interrogation by the authorities until counsel has been made available to him,

*unless* the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981) (emphasis added). Accordingly, absent such interrogation, an accused's self-initiated incriminating statements to the police would be admissible, as "there would have been no infringement" of his Miranda rights. Id. at 486. See Arizona v. Mauro, 481 U.S. 520, 529 (1987) ("'Confessions remain a proper element of law enforcement.'" (quoting Miranda, 384 U.S. at 478)); Oregon v. Elstad, 470 U.S. 298, 305 (1985) ("[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." (citation and internal quotation marks omitted)); Gates v. Commonwealth, 30 Va. App. 352, 357, 516 S.E.2d 731, 733 (1999) ("When the defendant [made self-initiated incriminating statements to the police], they were not required to ignore what they were hearing.").

In Innis, the United States Supreme Court clarified that "the term 'interrogation' under Miranda refers not only to express questioning," but also to "its functional equivalent," defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Innis, 446 U.S. at 300-01. Such words or actions would include "some sort of 'psychological ploy'" by the police. United States v. Blake, 571 F.3d 331, 341 (4th Cir. 2009) (quoting Mauro, 481 U.S. at 527); see Mauro, 481 U.S. at 527-30 (holding that suspect was not interrogated, as defined in Innis, where he "was not subjected to compelling influences, psychological ploys, or direct questioning"). This means that "police conduct would not qualify as interrogation simply because it 'struck a responsive chord' in a defendant." Acuosta v. Artuz, 575 F.3d 177, 189 (2d Cir. 2009) (quoting Innis, 446 U.S. at 303). "The test is whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response." Gates, 30 Va. App. at 355-56, 516 S.E.2d at 733 (citations and internal quotation

- 6 -

marks omitted).  Thus, if a suspect's statement was not reasonably "foreseeable," then his Miranda rights were not implicated.  Id.

We applied these principles in Gates on facts similar to those presented in the instant case.  There, after taking Gates into custody, two detectives took Gates to a police interview room to serve him with two arrest warrants.  As one of the detectives began reading to Gates the arrest warrant for a murder charge, Gates interrupted the detective and made incriminating statements regarding the murder.  Id. at 354-55, 516 S.E.2d at 732.  We rejected Gates' assertion that his statements were the product of a police interrogation.  We also rejected his argument that the interview room where the detectives executed the warrants transformed the encounter into the functional equivalent of an interrogation.  In doing so, we concluded the circumstances there presented did not "create a situation that the detectives should have known would produce incriminating responses."  Id. at 356, 516 S.E.2d at 733.

We reach the same conclusion here.  Much like the circumstances in Gates, Agent Wendel posed no questions to Adderley that prompted his incriminating statements.  Rather, shortly after arresting Adderley on a drug conspiracy charge and advising him of his Miranda rights, Agent Wendel merely advised Adderley that drugs and a firearm had just been discovered during the search of his apartment and that this would result in additional charges being brought against him after Detective Meador arrived to join Agent Wendel in taking Adderley to the magistrate's office for "processing."  It was then that Adderley made his incriminating statements.  Indeed, during the course of Adderley making those statements, Agent Wendel reminded Adderley that he had invoked his right to counsel, and thus Agent Wendel was not going to ask Adderley any questions.  Furthermore, we are not persuaded, as Adderly suggests, that the information Agent Wendel provided to Adderley was rendered impermissibly coercive because Adderley was sitting handcuffed in a police car at the time.  Based on the totality of the

- 7 -

facts here presented, this setting was no more a factor than the inside of the police interview room where the accused in Gates made incriminating statements in response to his murder charge being read to him. As explained in Innis, "'[i]nterrogation,' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Innis, 446 U.S. at 300.

Therefore, we conclude it was not reasonably foreseeable that Adderley would make his incriminating statements based on Agent Wendel's words or actions. That is to say, Adderley's statements "cannot properly be considered the result of police interrogation," or its functional equivalent, as there is no evidence indicating they were the product of "compelling influences, psychological ploys, or direct questioning." Mauro, 481 U.S. at 527. [2]

---

[2] The dissent states the majority "does not accurately reflect the entirety of the context of the initial statement made by Adderley to Special Agent Wendel." In support of this assertion, the dissent represents that the

> record shows . . . Wendel advised Adderley that "we had located his 15 pounds of marijuana and his gun where he had thrown [them] over to his neighbors residence" and that "Detective Meador is en route to meet us and he will be obtaining warrants for Possession with Intent to Distribute More than 5 Pounds of Marijuana While in Possession of Marijuana [sic]."

Focusing on the fact that Wendel purportedly indicated to Adderley that the police had recovered "his" gun and "his" marijuana, the dissent concludes Wendel should have known that such an accusation was likely to elicit an incriminating response.

First, what the dissent presents as a direct quote by Wendel is not evidence of what Wendel specifically stated to Adderley because the subject statement uses a third person possessive pronoun rather than a second person possessive pronoun, i.e., "his" contraband, as apposed to "your" contraband.

Second, the source of the statement is actually an exhibit that was initially attached to Adderley's legal memorandum filed in the trial court in support of his motion; and, in the memorandum, Adderley represented that the exhibit was a copy of "Special Agent Wendel's notes." However, at the hearing on Adderley's suppression motion, Wendel was not asked during his testimony to identify or explain any of his notes. Nor did Wendel testify at the hearing that he specifically stated to Adderley that the police had located "his gun" and "his 15 pounds of marijuana." Rather, Wendel simply indicated that he advised Adderley that the gun and marijuana had been discovered during the search of his residence.

- 8 -

This decision is consistent with the opinions of a majority of courts in other jurisdictions that have refused to endorse "the proposition that 'statements by law enforcement officials to a suspect regarding the nature of the evidence against the suspect constitute interrogation as a matter of law,' recognizing that '[i]t simply cannot be said that all such statements are objectively likely to result in incriminating responses by those in custody.'" Acosta, 575 F.3d at 191 (quoting United States v. Payne, 954 F.2d 199, 203 (4th Cir. 1992)). "'A few courts have found that talking about the evidence can be interrogation, even where the officer asks no questions. However, the majority of cases have gone the other way.'" Id. at 192 (quoting David M. Nissman & Ed Hagen, Law of Confessions § 5:8 (2d ed. 2009)).

In Payne, for example, the Fourth Circuit rejected Payne's claim that his incriminating statements were the product of an interrogation on facts nearly identical to those presented here. Payne was arrested on a drug-related transaction and apprised of his Miranda rights, at which time he indicated his desire to consult with an attorney. Payne, 954 F.2d at 200-01. Two FBI agents then transported Payne by car to the location where he would be turned over to the United States Marshals Service. Id. at 201. During the drive, one of the agents received a phone call in which she was informed that a handgun had been found at Payne's residence during the execution of a search warrant. Id. Afterwards, the agent "said to Payne, 'They found a gun at your house.' Payne responded, 'I just had it for my protection.'" Id. The Fourth Circuit agreed with the district court that "the rather innocuous statement [by the FBI agent] did not constitute

Third, the same document attached as an exhibit to Adderley's legal memorandum was subsequently attached to the Commonwealth's stipulation of facts and submitted to the trial court at the time Adderley entered his conditional guilty plea. However, no evidence (through Wendel's testimony or otherwise) was presented in regard to the document. Thus, there was again no evidence indicating that what was in the document reflected a verbatim report of what Wendel said to Adderley.

Finally, even if we assume *arguendo* Wendel specifically indicated to Adderley that the police found "his" gun and "his" marijuana when conducting the search of his residence, it does not change the result of our analysis in this case.

interrogation and should not result in the sanction of suppressing relevant and probative evidence." Id. at 203.[3]

In support of his argument that his incriminating statements were the product of interrogation, Adderley relies on Commonwealth v. Ferguson, 278 Va. 118, 677 S.E.2d 45 (2009), Hines v. Commonwealth, 19 Va. App. 218, 450 S.E.2d 403 (1994), and Pannell v. State, 7 So.3d 277 (Miss. Ct. App. 2008). His reliance on these cases is misplaced, however, as they are clearly distinguishable from the instant case.

Ferguson and Hines are distinguishable because, unlike the instant case, both involved incriminating statements made by a suspect in response to direct questioning by the police; and Ferguson involved direct threats against the suspect as well. The police in Ferguson took Ferguson, the suspect, into custody and placed him in a conference room at the police station, along with four officers, for the purpose of "question[ing]" him about a "breaking and entering." Ferguson, 278 Va. at 121, 677 S.E.2d at 46. After being advised of his Miranda rights, Ferguson invoked his right to counsel. At that point, one of the officers, Officer Hagerman, not only informed Ferguson that the police had a positive identification of Ferguson's car leaving the scene of the crime, but went on to "alternately threaten[] and attempt[] to cajole Ferguson into cooperation." Id. at 121-24, 677 S.E.2d at 47-48.

> Hagerman attempted to get Ferguson to talk to him by saying, "[i]f you want to go ahead and talk to me about this fine, if you don't, you know you're in trouble right now. Uh, I'm not, I'm not playing with you." Hagerman continued asking Ferguson questions such as "[W]here was you at yesterday? . . . Who was

[3] For other similar cases, see, for example: Acosta, 575 F.3d at 188-92; Blake, 571 F.3d at 338-43; Easley v. Frey, 433 F.3d 969, 971-74 (7th Cir. 2006); United States v. Allen, 247 F.3d 741, 765 (8th Cir. 2001), vacated and remanded on unrelated sentencing grounds, 536 U.S. 953 (2002); United States v. Conley, 156 F.3d 78, 82-84 (1st Cir. 1998); Enoch v. Gramley, 70 F.3d 1490, 1499-1501 (7th Cir. 1995); United States v Moreno-Flores, 33 F.3d 1164, 1168-70 (9th Cir. 1994); United States v. Benton, 996 F.2d 642, 643-44 (3d Cir. 1993); Shedelbower v. Estelle, 885 F.2d 570, 572-75 (9th Cir. 1991); United States v. Crisco, 725 F.2d 1228, 1230-32 (9th Cir. 1984).

with you yesterday? . . . What kind of work do you do?" and asked about Ferguson's source of money.

Id. at 122, 677 S.E.2d at 47. Hagerman also told Ferguson that "'he would bring the wrath of Hell on [Ferguson]'" and that "'if [Ferguson] ever [came] back to Pittsylvania County he would put him in jail.'" Id. One of the other officers, Officer Marr, then told Ferguson "to 'own up to what [he] did' and to think of his daughter and that Marr 'would try to help [him] as much as he could.'" Id. Shortly thereafter, Ferguson "'waived' his rights and confessed to the crime of breaking and entering." Id. Based on these facts, our Supreme Court held that "this encounter was one continuous custodial interrogation conducted in such a manner as to deliberately disregard a clear, unambiguous and unequivocal invocation of the right to counsel and coerce Ferguson to incriminate himself." Id. at 126, 677 S.E.2d at 49.

In Hines, City of Hampton Detective Seals took Hines, who was in custody in the Hampton jail, to police headquarters for questioning regarding a crime in Hampton for which he was charged. Newport News Detective Daniels was also present to question Hines regarding two robberies that occurred in Newport News. Hines, 19 Va. App. at 220, 450 S.E.2d at 403. Seals advised Hines of his Miranda rights and began questioning him, at which time Hines "became aggravated and said he wanted to return to his jail cell and speak to his attorney." Id. Seals nevertheless continued to question Hines, asking him "whether you're going to be a witness or a defendant in the matter," after which Hines made incriminating statements. Id. Hines then made incriminating statements to Daniels in response to Daniels' questions regarding the Newport News robberies. Id. at 220, 450 S.E.2d at 403-04. On those facts, we held that Hines' incriminating statements were the product of "the police officer's further inquiry to Hines" after he had invoked his right to counsel, in violation of his Fifth Amendment rights.

As to Pannell, it is distinguishable from the instant case based on the nature and scope of the police officer's presentation of incriminating evidence to the suspect, which prompted his

incriminating statements, after he invoked his <u>Miranda</u> rights. In addition, we take issue with the Mississippi Court of Appeals' analysis of <u>Innis</u> in reaching its decision in <u>Pannell</u>. There, a meeting was arranged between Pannell, who was being held in jail as a suspect in an arson investigation, and the jail administrator, Officer Taylor, who "also happened to be the investigating officer of the alleged arson." <u>Pannell</u>, 7 So.3d at 280. At the meeting between Taylor and Pannell, with another officer standing by, Pannell stated that he did not want to talk about the fire without his attorney present. <u>Id.</u> Taylor then "notified Pannell that he had compiled strong evidence against him and proceeded to show Pannell the contents of the evidence file." <u>Id.</u> After Pannell reviewed the evidence against him, he confessed to the crime. <u>Id.</u> The Mississippi Court of Appeals held that Taylor's actions constituted the functional equivalent of interrogation, in violation of Pannell's <u>Miranda</u> rights, and that his confession was therefore inadmissible. In doing so, the court observed it was "obvious . . . that Officer Taylor showed Pannell the evidence file in an attempt to have him reconsider his request for counsel; a tactic that proved successful as Pannell was not prompted to speak until he reviewed the evidence placed before him." <u>Id.</u> at 284. "Under these circumstances," the court concluded, "we believe that Officer Taylor should have known that his actions were likely to elicit an incriminating response. It is clear that his actions aided in creating a coercive interrogation environment that subjugated Pannell to the will of his examiners, thereby undermining his right against compulsory self-incrimination." <u>Id.</u> at 285.

First, in contrast to <u>Pannell</u>, there is no evidence in the instant case that Agent Wendel's words or actions created any "coercive interrogation environment" that "subjugated" Adderley to Wendel's "will" as an "examiner[]." <u>Id.</u> Wendel did not place Adderley in a meeting room in the jail, with another officer standing by, and place before him all of the evidence that the police had compiled against him, in an "obvious . . . attempt to have him reconsider his request for

- 12 -

counsel," as occurred in Pannell. Id. at 284. Rather, Wendel simply advised Adderley, while on their way to the magistrate's office for processing, of what Wendel had just learned in reference to items found during the search of Adderley's apartment, i.e., a large bundle of marijuana and a firearm, and that this discovery would result in additional charges. Once again, we view this statement by Agent Wendel, as did the Fourth Circuit in Payne with regard to a nearly identical statement made by an FBI agent to a suspect in a nearly identical setting, as a "rather innocuous statement [that] did not constitute interrogation and should not result in the sanction of suppressing relevant and probative evidence." Payne, 954 F.2d at 203.

Second, in Pannell, the Mississippi Court of Appeals appears to have equated what it referred to as Innis' admonition against "'positing the guilt of the subject'" with "advis[ing] [a suspect] of incriminating evidence," and thus viewed the latter as the functional equivalent of interrogation. Pannell, 7 So.3d at 284 (quoting Innis, 446 U.S. at 299). To the extent the Pannell court was making that overly generalized analytical connection, it was based on a misreading of Innis. The Pannell court's above-referenced quote from Innis ("'positing the guilt of the subject'") was actually a modified quote from Miranda that the Supreme Court used in Innis. The Innis Court used the quote when *summarizing* the Miranda Court's survey of interrogation practices that evoked the Miranda Court's concern, including, as stated in Innis, "the use of psychological ploys, such as to '[posit]' 'the guilt of the subject.'" Innis, 446 U.S. at 299 (quoting Miranda, 384 U.S. at 450 (bracketed insert in Innis)). Turning to the actual text in Miranda, we find that the subject quote in Innis was a shorthand reference to the Supreme Court's lengthy description in Miranda of police manuals documenting "the most effective psychological stratagems to employ during interrogations." Miranda, 384 U.S. at 449 n.9. Where the Supreme Court in Miranda made reference to the part of the manuals instructing that "[t]he guilt of the subject is to be posited as a fact," this instruction, as described in Miranda, was

not made in isolation.  Id. at 450.  Rather, as the Supreme Court more fully explained, it was part of an elaborate, multifaceted, and integrated strategy for conducting interrogations involving "patience and perseverance" on the part of the "interrogator" in his treatment of the suspect, which was ultimately "designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty.  Explanations to the contrary are dismissed and discouraged."  Id. at 449-50.

Accordingly, contrary to the analysis of the Mississippi Court of Appeals in Pannell, the majority of courts have rightly rejected the proposition that Miranda, as clarified by Innis, dictates that advising a suspect of incriminating evidence necessarily constitutes the functional equivalent of interrogation.

For these reasons, we conclude the trial court did not err in denying Adderley's motion to suppress his incriminating statements, as they were not the product of police interrogation, or its functional equivalent.  We therefore affirm his conviction.

Affirmed.

Humphreys, J., concurring, in part, and dissenting, in part.

The majority opinion does not accurately reflect the entirety of the context of the initial statement made by Adderley to Special Agent Wendel. The record shows that after the phone call from Detective Meador in which he asked Special Agent Wendel not to transport Adderley into the facility until he arrived, Wendel advised Adderley that "we had located his 15 pounds of marijuana and his gun where he had thrown over to his neighbors residence" and that "Detective Meador is en route to meet us and he will be obtaining warrants for Possession with Intent to Distribute More than 5 Pounds of Marijuana While in Possession of Marijuana."[4] Wendel told Adderley that Detective Meador might also be getting a warrant for conspiracy. In my view, the statement to Adderly that "we had located his 15 pounds of marijuana and his gun where he had thrown over to his neighbors residence," was an accusation by Special Agent Wendel that any reasonable person should know was "reasonably likely to elicit an incriminating response from the suspect," and thus constituted the functional equivalent of an interrogation. Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

---

[4] In fairness to the position of the majority, I note that these quotes from Specail Agent Wendel are contained in a written report that Wendel prepared in this case, and although he was never asked specifically about them, he neither repeated them nor denied making them during his testimony at the suppression hearing. This report was not formally admitted as an exhibit at the suppression hearing. However, it was attached as an exhibit to the motion to suppress and, without objection by the Commonwealth, the trial court was asked to review it during Special Agent Wendel's testimony. Moreover, the written report was later part of the evidence stipulated to by the parties at the subsequent trial. While I do not condone departure from the proper procedures for the introduction of relevant exhibits, it is clear from the record as a whole in this case, that the exact words Special Agent Wendel used in his dialogue with Adderley were before the court at the suppression hearing in the same manner as if Wendel's written report had been properly and formally admitted as an exhibit. See Whittaker v. Commonwealth, 217 Va. 966, 969, 234 S.E.2d 79, 81 (1977) ("The unilateral avowal of counsel, if unchallenged is a proper proffer."). Also, while the majority cavils about the pronouns actually used by Wendel, it nevertheless ignores the basic point that any reasonable person would conclude that specific accusations of wrongdoing, such as those Wendel admits he made to Adderley, invite a response and are, thus, the functional equivalent of an interrogation.

"The test is 'whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response.'" Gates v. Commonwealth, 30 Va. App. 352, 355-56, 516 S.E.2d 731, 733 (1999) (quoting Timbers v. Commonwealth, 28 Va. App. 187, 196, 503 S.E.2d 233, 238 (1998)). "'If a statement is not foreseeable, then it is volunteered.'" Id. at 356, 516 S.E.2d at 733 (quoting Blain v. Commonwealth, 7 Va. App. 10, 15, 371 S.E.2d 838, 841 (1988)). The statement that "we had located *his* 15 pounds of marijuana and *his* gun where he had thrown over to his neighbors residence," goes beyond statements made by police that resemble the type of information "normally attendant to arrest and custody." Innis, 446 U.S. at 301. Wendel should have known that an accusation that "his" gun and marijuana had been found was likely to elicit a response.

The majority opinion also relies on the Fourth Circuit case of United States v. Payne, 954 F.2d 199, 203 (4th Cir. 1992), to support its conclusion that the initial statement by Wendel was simply a "rather innocuous statement [that] did not constitute interrogation and should not result in the sanction of suppressing relevant and probative evidence." Id. Payne is not binding precedent on this Court, and I find its rationale to be unpersuasive. In any event, unlike Payne, in which the FBI agent stated "[t]hey found a gun at your house," id. at 201, Wendel went beyond just a statement informing Adderley of discovery of evidence. As noted above, Wendel stated that they discovered marijuana and a gun, and then specifically stated that they found it "where he had thrown [it] over to his neighbors residence." Wendel then went further and told Adderley that Meador was on his way to meet them to obtain additional warrants based on this discovery. In context, Wendel's statements were not simply "innocuous," but in my view were "reasonably likely to elicit an incriminating response" from Adderley. Innis, 446 U.S. at 301.

However, I do agree with the majority that the trial court did not err in admitting Adderley's statements after Agent Wendel reminded Adderley that he had invoked his rights to

- 16 -

both silence and counsel under the Fifth Amendment.  His subsequent incriminating statements were largely volunteered and not the product of an interrogation and thus fall under the doctrine announced in Edwards v. Arizona, 451 U.S. 477 (1981).  Moreover, with respect to those subsequent statements that were not volunteered, Adderley effectively waived his right to counsel and to remain silent by re-initiating the conversation with Special Agent Wendel after he was reminded repeatedly that he had previously invoked his constitutional rights under Miranda.

Because this case involves a conditional guilty plea under Code § 19.2-254, a harmless error analysis is not appropriate, and, therefore, I would remand this case to the trial court with direction that it permit Adderley to withdraw his guilty plea, if he so chooses, and proceed to trial without permitting the Commonwealth to use the single statement made by Adderley that "the gun was not loaded and he would never use it against anyone and that he only had it to scare people for his own protection because he was labeled or known as a, quote, snitch."