[Cite as *State v. Guysinger*, 2012-Ohio-4169.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | |
| | : | |
| Plaintiff-Appellee, | : | |
| | : | Case No. 11CA3251 |
| v. | : | |
| | : | DECISION AND |
| Justin K. Guysinger, | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | Filed: September 7, 2012 |

_____

APPEARANCES:

Pamela C. Wells, Chillicothe, Ohio, for Appellant.

Matthew S. Schmidt, Ross County Prosecuting Attorney, and Jeffrey C. Marks, Ross County Assistant Prosecuting Attorney, Chillicothe, Ohio, for Appellee.

_____

Kline, J.:

{¶1}   Justin Guysinger appeals the judgment of the Ross County Court of Common Pleas, which denied Guysinger's motion to suppress.  On appeal, Guysinger contends that his *Miranda* rights were violated when he confessed to aggravated robbery.  Because law enforcement did not subject Guysinger to a custodial interrogation, we disagree.  Accordingly, we affirm the judgment of the trial court.

I.

{¶2}   On the morning of August 6, 2010, a masked intruder woke up a woman (hereinafter the "Victim") in her home.  The intruder pointed a firearm at the Victim and asked her where her medications were located.  The Victim told the intruder that she did not have any medications.  The intruder stated that the Victim's grandson had informed

him that there were medications in the Victim's home. The intruder then left the home, and the Victim noticed that some diabetic syringes were missing from her kitchen table.

{¶3} Shortly thereafter, Deputies Gallagher and Rose arrived at the Victim's home to investigate the incident. The deputies asked the Victim who she thought the intruder might be. The Victim responded that Guysinger's name "came to mind, [but] she hated to think that it was him, because he was such a frequent friend of the family." Hearing Tr. at 10. The deputies walked down the street in the direction of muddy footprints in the Victim's yard. The deputies encountered a woman who told them that she had seen an individual walking down the street early in the morning. The woman told the deputies that "she thought but couldn't say for certain that it was Justin Guysinger[.]" *Id.* at 12. The deputies also discovered a dark ski mask on the ground on the side of the street.

{¶4} Eventually, the deputies went to Guysinger's house. Guysinger's mother answered the door, and she summoned Guysinger. After speaking briefly at the door, the deputies asked Guysinger if they could see his tennis shoes. Guysinger and his mother then gave the deputies permission to enter the house. Upon entering the home, the deputies observed that there were syringes on the floor that were similar to the syringes at the Victim's home. After viewing Guysinger's muddy tennis shoes, Deputy Gallagher asked Guysinger if he knew anything about the incident. Guysinger then stated that he wanted a lawyer and that he did not want to speak with the deputies. Next, Deputy Gallagher handcuffed Guysinger and placed him in the backseat of a police cruiser.

{¶5}     Deputy Gallagher then made a phone call to secure a search warrant of Guysinger's house.  While waiting for the warrant, a dog sat near a couch in the room where Deputy Gallagher was waiting.  The dog's tail struck an object that briefly came into view.  At that point, Deputy Gallagher saw the object, and he identified it as a firearm that apparently matched the Victim's description of the firearm from the incident.  Deputy Gallagher returned to the cruiser, and he informed Guysinger about the firearm.  Deputy Gallagher told Guysinger "that it was more than likely in his best interest to start thinking about the situation and how things were going."  Hearing Tr. at 21.  He also stated that Guysinger should "just be honest about the situation."  Id. at 25.

{¶6}     Deputy Gallagher then returned to the house.  Ten-to-fifteen minutes later, Guysinger informed another law enforcement official at the scene that he wanted to speak with Deputy Gallagher.  Deputy Gallagher then went out to the cruiser, and Guysinger confessed to the crime.  Guysinger indicated that he had a drug problem, and he stated that he was sorry about the incident because the Victim was a family friend.  Deputy Gallagher then advised Guysinger that it was in Guysinger's best interest not to make any further statements because law enforcement had not yet informed Guysinger of his Miranda rights.

{¶7}     A grand jury indicted Guysinger on one count of aggravated robbery.  Guysinger moved to suppress his confession, and the trial court held a hearing on the motion.  Following the hearing, the trial court ruled from the bench.  The trial court concluded that Guysinger's confession was not made during a custodial interrogation.  Consequently, the court denied Guysinger's motion to suppress.  Guysinger then pled no contest to aggravated robbery.

**{¶8}** Guysinger appeals and asserts the following assignment of error: I. "THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION TO SUPPRESS HIS STATEMENTS THAT WERE OBTAINED IN VIOLATION OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION."

## II.

**{¶9}** In his sole assignment of error, Guysinger argues that the trial court erred when it denied his motion to suppress the confession he made to Deputy Gallagher. Guysinger essentially advances two arguments. Guysinger contends that because he invoked his Fifth Amendment right to counsel, the state needed to establish that Guysinger waived his right to counsel before obtaining his confession. Guysinger also contends that he confessed during a custodial interrogation prior to receiving his *Miranda* warnings.

**{¶10}** Our "review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. Therefore, we "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. "Accepting these facts as true, [we] must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

*Accord Roberts* at ¶ 100; *State v. Stepp*, 4th Dist. No. 09CA3328, 2010-Ohio-3540, ¶ 14.

**{¶11}** "[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the [Fifth Amendment] privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Those safeguards include informing the defendant that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479.

**{¶12}** For Guysinger to prevail, law enforcement must have subjected him to a custodial interrogation. This is so because "the requirement that police officers administer *Miranda* warnings applies only when a suspect is subjected to both custody and interrogation." *State v. Dunn*, 131 Ohio St.3d 325, 2012-Ohio-1008, 964 N.E.2d 1037, ¶ 24 In other words, "*Miranda* rights only attach when both custody and interrogation coincide." *State v. Tellington*, 9th Dist. No. 22187, 2005-Ohio-470, ¶ 8, citing *State v. Wiles*, 59 Ohio St.3d 71, 83, 571 N.E.2d 97 (1991). Moreover, "an individual has a right to counsel only when he is in custodial interrogation, as a suspect, or once adversary proceedings have commenced and he becomes a defendant. See, e.g., *Davis v. United States* (1994), 512 U.S. 452, 456-457, 114 S.Ct. 2350, 129 L.Ed.2d 362. The person can only invoke that right during those times." *State v. Adams*, 11th Dist. No. 2003-T-0064, 2005-Ohio-348, ¶ 43. Here, we conclude that law

enforcement never subjected Guysinger to a custodial interrogation. As a result, Guysinger never had the right to counsel, and he cannot demonstrate that the trial court erred in denying his motion to suppress.

A.

**{¶13}** Initially, we find that Guysinger was not subjected to a custodial interrogation during his initial encounter with law enforcement officers -- that is, the encounter with law enforcement officers at Guysinger's own home. "[A]n individual has been placed into custody [if], under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *State v. Gumm*, 73 Ohio St.3d 413, 429, 653 N.E.2d 253 (1995), quoting *U.S. v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Here, the record shows that Guysinger invited the deputies into his home, and there is no evidence that the deputies used any coercive tactics. In other words, "the location and circumstances of the inquiry demonstrate appellant's freedom of movement or action was not curtailed in *any* way." (Emphasis sic.) *Willoughby v. Dunham*, 11th Dist. No. 2010-L-068, 2011-Ohio-2586, ¶ 47. As a result, we conclude that a reasonable person in Guysinger's position would "have believed that he was * * * free to leave." *Gumm* at 429, quoting *Mendenhall* at 554. Therefore, Guysinger was not in custody during the interrogation at his own home. *See Dunham* at ¶ 47. And because there was no *custodial* interrogation during Guysinger's initial encounter with law enforcement officers, his Fifth Amendment right to counsel had not yet attached. *See State v. Boyd*, 4th Dist. No. 02CA744, 2003-Ohio-983, ¶ 7 ("In a non-custodial interrogation, law enforcement officers do not need to give *Miranda* warnings and no right to counsel attaches.").

B.

{¶14}  Next, we find that Guysinger was not subjected to a custodial interrogation during his time in the police cruiser -- that is, when Deputy Gallagher informed Guysinger about the firearm under the couch.

> [T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.  That is to say the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police.  (Footnote omitted.)  *Rhode Island v. Innis*, 446 U.S. 291, 300-301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

{¶15}  "[T]o determine whether a suspect has been 'interrogated,' the heart of the inquiry focuses on police coercion, and whether the suspect has been compelled to speak by that coercion."  *State v. Tucker*, 81 Ohio St.3d 431, 436, 692 N.E.2d 171 (1998).  Additionally, "[o]fficers do not interrogate a suspect simply by hoping that he will

incriminate himself." *Arizona v. Mauro*, 481 U.S. 520, 529, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987).

{¶16} As it relates to informing Guysinger about the firearm under the couch, Deputy Gallagher testified as follows:

{¶17} "Deputy Gallagher: I went out and I spoke with Mr. Guysinger who was in the cruiser and I told him what had occurred with the dog and that we believed that the firearm that was found was the one that was used in the commission of this crime according to the description given by the victim.

{¶18} "[State]: Did he say anything to you at that point in time?

{¶19} "Deputy Gallagher: He just kind of sat and was kind of quiet and I told him that it was more than likely in his best interest to start thinking about the situation and how things were going." Hearing Tr. at 21.

{¶20} Deputy Gallagher also testified that "these were statements, these weren't questions I made to [Guysinger], there was a statement I made when the firearm was found and that he needed, it was going to be in his best interest of benefit to him [sic] if he started to think about these circumstances and situation of the case. And basically, just be honest about the situation." *Id.* at 25.

{¶21} Approximately ten to fifteen minutes later, Guysinger asked to speak to Deputy Gallagher. Deputy Gallagher testified that "I walked out to the cruiser and [Guysinger] starts to basically confess to the crime and tells me why he had done it. * * * I can't say verbatim exactly [what] he said but it was * * * that he had done it and he was sorry because [the Victim was] friends of his family and he had a bit of a drug issue and that's why he had done it." *Id.* at 23. Deputy Gallagher then advised Guysinger that it

was in Guysinger's best interest not to make any further statements because law enforcement had not advised Guysinger of his *Miranda* rights.

**{¶22}** Courts have held that confronting a defendant with inculpatory evidence does not necessarily amount to interrogation. *See, e.g.*, *U.S. v. Payne*, 954 F.2d 199, 203 (4th Cir.1992). In *Payne*, an FBI agent told the defendant, "They found a gun at your house[,]" and the defendant responded, "I just had it for my protection." *Id.* at 201. The defendant was later convicted on a weapons charge. *Id.* In holding that the agent's statement was not an interrogation, the court noted that "the *Innis* [446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297] definition of interrogation is not so broad as to capture within *Miranda*'s reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." *Id.* at 202. Additionally, the court noted that "[i]nformation about the evidence against a suspect may also contribute to the intelligent exercise of his judgment regarding what course of conduct to follow." *Id.* *See also U.S. v. Allen*, 247 F.3d 741, 765 (8th Cir.2001) ("[I]nforming Allen of the results of the lineup did not amount to the functional equivalent of interrogation for purposes of the Fifth Amendment."), *vacated on other grounds*, *Allen v. U.S.*, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002); *Easley v. Frey*, 433 F.3d 969, 974 (7th Cir.2006) ("[W]e do not believe that Long's statement regarding the evidence and the possible consequences of the charges Easley faced rose to the level of interrogation[.]"); *Shedelbower v. Estelle*, 885 F.2d 570, 572-573 (9th Cir.1989) (holding that interrogation did not occur where police truthfully told defendant that co-defendant was also in custody and falsely stated that the victim had identified defendant as a perpetrator).

**{¶23}** Here, we conclude that Deputy Gallagher's statements to Guysinger about the firearm did not amount to interrogation. Deputy Gallagher said that he had seen a firearm in Guysinger's living room that matched the victim's description of the firearm from the incident. Deputy Gallagher then told Guysinger that it was "likely in his best interest to start thinking about the situation and how things were going[,] * * * [a]nd basically, just be honest about the situation." Hearing Tr. at 21, 25. Deputy Gallagher's statements were consistent with the *Payne* court's rationale that informing a defendant of the evidence against him could "contribute to the intelligent exercise of [the defendant's] judgment regarding what course of conduct to follow." *Payne* at 202.

**{¶24}** We also find it significant that, after Deputy Gallagher informed Guysinger about the firearm, Deputy Gallagher left the cruiser and returned to the home. This indicates that Deputy Gallagher's statements about the firearm did not seek or require a response*. See Payne* at 203. Additionally, Guysinger asked to speak with Deputy Gallagher ten-to-fifteen minutes after learning about the firearm. Guysinger's actions indicate that he was not compelled to speak by police coercion. Moreover, "the police surely cannot be held accountable for the unforeseeable results of their words or actions[.]" *Innis* at 301-302. Consequently, the record shows that Deputy Gallagher's statements about the firearm were not statements that he "should [have] know[n] [were] reasonably likely to elicit an incriminating response from [Guysinger]." *Id.* at 301.

**{¶25}** Thus, for the reasons stated above, the record shows that Guysinger did not confess to the crime in the context of a custodial interrogation.

C.

{¶26} In conclusion, we find that custody and interrogation of Guysinger never coincided prior to his confession. Here, Guysinger was not in custody during the interrogation at his own home, and Guysinger was not interrogated after he was taken into custody. And because Guysinger was not subjected to a custodial interrogation, he did not have the right to counsel. *See Adams*, 2005-Ohio-348, at ¶ 43. Therefore, law enforcement officers did not obtain a confession in violation of Guysinger's Fifth Amendment rights, and the trial court did not err when it denied Guysinger's motion to suppress. Accordingly, we overrule Guysinger's assignment of error and affirm the judgment of the trial court.

**JUDGMENT AFFIRMED.**

Harsha, J., dissenting:

{¶27}   I agree with the majority's statement of the law but conclude it has erred in applying it.  In my view the officer's statement to Guysinger about finding the gun and advising him it was "in his best interest to start thinking about the situation and how things were going(,)" was the functional equivalent of interrogation.  These "statements" by the deputy to Guysinger were reasonably likely to illicit an incriminatory response. *See Innis*, *supra*, at 301.  Thus, Guysinger, who was in custody at that time, was entitled to *Miranda's* prophylactic protection and its attendant notice of the right to counsel under the Fifth Amendment.

{¶28}   In an analogous case involving questioning after a suspect had invoked the right to counsel, the Supreme Court of Ohio held the police statement "We wanted to talk to you about Bobby Bennett" was the functional equivalent of interrogation.  *See State v. Knuckles*, 65 Ohio St.3d 494, 497, 605 N.E.2d 54 (1992).  The court held the police statement was not an "offhand remark" as was the case in *Innis*.  *Id.*  The *Knuckles* court also concluded the statement invited a response.  *Id.*  Finally, the court concluded the statement was not a routine booking question.

{¶29}   I conclude the statements to Guysinger are of the same type as those in *Knuckles* in that they are evocative, i.e. inviting a response.  *See Innis* at 303.  Specifically, the deputy's instruction to think about the situation was a psychological ploy or calculated stratagem designed to elicit an incriminating response.  See *Arizona v. Manro* (1987), 481 U.S. 520, at 529, and *Eastley v. Fry* (CA 6 2006), 433 F.2d 969, at 971.  Clearly, these statements were not routine booking questions or mere offhand

comments, but rather were the functional equivalent of interrogation.  Thus, *Miranda*

applied and I respectfully dissent.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED.  Appellant shall pay the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.  Exceptions.

Abele, P.J.:  Concurs in Judgment & Opinion.
Harsha, J.:   Dissents with Opinion.


                         For the Court


                         BY:_____
                              Roger L. Kline, Judge



### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**